STATE OF CONNECTICUT *v.* KEVIN ROBINSON
(AC 27282)

Flynn, C. J., and Bishop and Borden, Js.

Argued September 6, 2007—officially released January 8, 2008

*Elizabeth M. Inkster*, senior assistant public defender, with whom, on the brief, was *Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Michael A. DeJoseph*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Kevin Robinson, appeals from the judgment of conviction, rendered after a trial to the court, of (1) possession of narcotics, namely, one-half gram or more of cocaine in a freebase form, with intent to sell or dispense by a person who is not drug-dependent in violation of General Statutes (Rev. to 2003) § 21a-278 (a),[1] (2) possession of narcotics, namely, cocaine in a freebase form, with intent to sell or dispense within 1500 feet of a school in violation of General Statutes § 21a-278a (b),[2] (3) possession of a

[1] General Statutes (Rev. to 2003) § 21a-278 (a), which was the revision of the statute in effect at the time of the defendant's violation of this statute, provides in relevant part: "Any person who . . . possesses with the intent to sell or dispense . . . substances containing . . . an aggregate weight of one-half gram or more of cocaine in a free-base form . . . and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years or more than twenty years; and, a maximum term of life imprisonment. . . ."

[2] General Statutes § 21a-278a (b) provides in relevant part: "Any person who violates section . . . 21a-278 by . . . possessing with the intent to sell or dispense . . . any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school . . . shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive

hallucinogenic substance, namely, phencyclidine, in violation of General Statutes § 21a-279 (b),[3] and (4) possession of a hallucinogenic substance, namely, phencyclidine, within 1500 feet of a school in violation of General Statutes § 21a-279 (d).[4] The defendant claims that (1) the trial court improperly denied his motion to suppress tangible evidence seized from him following his arrest,[5] and (2) his conviction under § 21a-278 (a)[6] must be reversed pursuant to the dictates of the United States Supreme Court decision in *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).[7] We affirm the judgment of the trial court.

The defendant was charged in a four count information alleging the four drug offenses noted. Prior to trial,

to any term of imprisonment imposed for violation of section . . . 21a-278. . . ."

[3] General Statutes § 21a-279 (b) provides in relevant part: "Any person who possesses . . . any quantity of a hallucinogenic substance other than marijuana or four ounces or more of a cannabis-type substance . . . for a first offense, may be imprisoned not more than five years or be fined not more than two thousand dollars or be both fined and imprisoned . . . ."

[4] General Statutes § 21a-279 (d) provides in relevant part: "Any person who violates subsection . . . (b) . . . of this section in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school . . . shall be imprisoned for a term of two years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of subsection . . . (b) . . . of this section."

[5] Although at various points in his arguments on the motion to suppress, the defendant refers to the Connecticut constitution, he fails to offer any independent analysis thereunder. To the extent that he makes constitutional arguments, therefore, we consider them only under the United States constitution. See *State* v. *Canales*, 281 Conn. 572, 592 n.12, 916 A.2d 767 (2007).

[6] In his brief, the defendant mistakenly refers to the statute as General Statutes § 21a-278 *(b)*. He was neither charged with, nor convicted of, a violation of that statute, however. We glean from the substance of his argument that he means to challenge his conviction under § 21a-278 *(a)*, and we address his claims accordingly.

[7] The rule articulated in *Apprendi*, on which the defendant relies, is as follows: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi* v. *New Jersey*, supra, 530 U.S. 490.

he moved to suppress certain tangible evidence that had been seized from his person following his warrantless arrest for criminal trespass in the third degree in violation of General Statutes § 53a-109 (a) (1).[8] After an evidentiary hearing, the court, *Dooley, J.*, denied the motion to suppress. Thereafter, the defendant waived his right to a jury trial, and, after a trial to the court, *Jennings, J.*, the court found him guilty on all four counts and rendered the judgment of conviction. This appeal followed.

The court reasonably could have found the following facts, all of which occurred on March 4, 2004, at 75 South Main Street, Norwalk. On count one, the defendant possessed seventeen packets containing 2.59 grams of crack cocaine, with the intent to sell or dispense, and did not carry his burden of persuasion that he was drug-dependent. On count two, the defendant possessed with intent to sell or dispense a plastic bag containing cocaine in a freebase form within 1500 feet of the Side By Side community school. On count three, the defendant possessed a ziplock bag containing marijuana laced with phencyclidine, commonly known as angel dust or PCP. On count four, the possession under count three was within 1500 feet of the Side By Side community school. Additional facts will be stated as necessary.

I

The defendant first claims that the court improperly denied his motion to suppress because the drugs that

[8] General Statutes § 53a-109 (a) provides: "A person is guilty of criminal trespass in the third degree when, knowing that such person is not licensed or privileged to do so: (1) Such person enters or remains in premises which are posted in a manner prescribed by law or reasonably likely to come to the attention of intruders or are fenced or otherwise enclosed in a manner designed to exclude intruders, or which belong to the state and are appurtenant to any state institution; or (2) such person enters or remains in any premises for the purpose of hunting, trapping or fishing; or (3) such person enters or remains on public land which is posted in a manner prescribed by law or reasonably likely to come to the attention of intruders or is fenced or otherwise enclosed in a manner designed to exclude intruders."

were seized from his person at the Norwalk police station following his warrantless arrest for criminal trespass in the third degree at 75 South Main Street, Norwalk, on March 4, 2004, were illegally seized in violation of his constitutional and statutory rights. In support of his claim, the defendant argues that (1) his initial arrest was not based on probable cause and, therefore, the search incident to it was invalid, (2) the ensuing search of his body constituted an unconstitutional and illegal strip search pursuant to the fourth amendment and General Statutes §§ 54-33k and 54-33*l*[9]

---

[9] General Statutes § 54-33k, which defines "strip search," provides: "For the purposes of this section and section 54-33*l*, 'strip search' means having an arrested person remove or arrange some or all of his or her clothing or, if an arrested person refuses to remove or arrange his or her clothing, having a peace officer or employee of the police department remove or arrange the clothing of the arrested person so as to permit a visual inspection of the genitals, buttocks, anus, female breasts or undergarments used to clothe said anatomical parts of the body."

General Statutes § 54-33*l* provides: "(a) No person arrested for a motor vehicle violation or a misdemeanor shall be strip searched unless there is reasonable belief that the individual is concealing a weapon, a controlled substance or contraband.

"(b) No search of any body cavity other than the mouth shall be conducted without a search warrant. Any warrant authorizing a body cavity search shall specify that the search is required to be performed under sanitary conditions and conducted either by or under the supervision of a person licensed to practice medicine in accordance with chapter 370.

"(c) All strip searches shall be performed by a person of the same sex as the arrested person and on premises where the search cannot be observed by persons not physically conducting the search or not absolutely necessary to conduct the search.

"(d) Any peace officer or employee of a police department conducting a strip search shall (1) obtain the written permission of the police chief or an agent thereof designated for the purposes of authorizing a strip search in accordance with this section and section 54-33k and (2) prepare a report of the strip search. The report shall include the written authorization required by subdivision (1) of this subsection, the name of the person subjected to the search, the name of any person conducting the search and the time, date and place of the search. A copy of the report shall be provided to the person subjected to the search.

"(e) Nothing in this section shall preclude prosecution of a peace officer or employee under any other provision of the general statutes.

"(f) Nothing in this section shall be construed as limiting any statutory or common law rights of any person for purposes of any civil action or injunctive relief.

because it was conducted without an adequate cause to believe that he had drugs hidden on his person and (3) the search constituted an illegal body cavity search in violation of § 54-33*l* (b). We reject his claim.

The defendant moved in the trial court to suppress the following evidence, which had been seized from his body in a search at the Norwalk police department following his arrest: seventeen packets containing crack cocaine; one plastic bag containing loose cocaine; and two plastic ziplock bags containing marijuana laced with angel dust. All of these individual bags were themselves contained within a larger plastic bag that, as the court found,[10] was held by the defendant between his buttocks and was dislodged therefrom by the police during a strip search. The defendant made only two claims in the trial court: (1) his initial arrest at 75 South Main Street for criminal trespass was not based on probable cause and was, therefore, in violation of the fourth amendment; and (2) even if the initial arrest was based on probable cause, it was a body cavity search made without a warrant and, therefore, in violation of § 54-33*l*. See footnote 9.

The state presented the following evidence at the suppression hearing. In March, 2004, Officer Marc Lepore had been a member of the Norwalk police department for eight years, had received extensive training and experience in narcotics enforcement and was familiar with the practices involved in street sales of drugs. Lepore had known the defendant for six or seven years and had worked with a confidential informant who had

---

"(g) The provisions of this section and section 54-33k shall not apply when the person is remanded to a correctional institution pursuant to a court order."

[10] Although the defendant testified at the hearing and gave an account that was wholly contrary to that of the police officers who testified, the court specifically credited the testimony of the police officers and discredited the defendant's version of events. We therefore state the facts as the state presented them.

purchased narcotics from the defendant on two occasions. Both of these purchases had been witnessed by police officers and corroborated. Since January, 2000, Lepore had been a member of the special services division that investigated narcotics crimes, among others.

On March 4, 2004, the special services division focused on 75 South Main Street because residents of that building had complained about drug dealers loitering in and selling drugs in the front yard of the premises. The premises consisted of a multifamily housing unit, with a front courtyard and a parking lot. A cement wall, about four feet high, stood between the courtyard and the sidewalk adjoining the street. A chain-link fence surrounded the other three sides of the premises.[11] A gateless entryway in the wall facing the street allowed pedestrians to access the courtyard. A set of stairs led from the sidewalk up to the entryway in the wall. As the officers drove by the premises, Lepore noticed the defendant and a woman standing in the front courtyard. Lepore knew the woman from previous arrests, including arrests for possession of narcotics. As the officers approached the premises, the woman noticed Lepore and said something to the defendant. Lepore then observed the defendant duck down behind the wall that was between the courtyard and the street. The officers entered into the courtyard through the gateless opening in the wall. Lepore noticed that the defendant was squatting down and had his right hand down the back of his pants, "fiddling around with something." Because of his training and experience, Lepore knew that some

---

[11] At the suppression hearing, the defendant testified that the chain-link fence was not in place at the time of the arrest. Lepore testified, however, that it was, and the court credited Lepore's testimony. The defendant does not argue on appeal that the court's determination as to the existence of the chain-link fence was clearly erroneous. Therefore, we presume that the chain-link fence completely surrounded the other sides of the property at the relevant time, as Lepore testified.

drug dealers hid drugs down their pants and between their buttocks to evade detection. Lepore asked the defendant what he was doing. The defendant answered that he was tying his shoe, an answer that the officer did not believe because it was inconsistent with the position of the defendant's hands.

Lepore then asked the defendant whether he lived in the building. The defendant answered that he did not. Lepore further asked whether the defendant was on the premises visiting someone. The defendant again answered no.[12] The officer then arrested the defendant for criminal trespass.

After the defendant was placed under arrest, the officers handcuffed him and walked him out of the courtyard to the street.[13] At some point while leading the defendant from the courtyard, an anonymous informant told the officers that the defendant had put drugs down his pants. While awaiting the arrival of a patrol car to transport the defendant to the police station, Lepore conducted a patdown search. Although the officer did not find anything unusual as a result of the patdown, Lepore testified that the defendant "freaked out" when he attempted to pat down the seat of the defendant's pants. Specifically, Lepore stated that the defendant "started yelling and screaming, twisting and turning" and resisted the officer's attempt to conduct the patdown search further.

At the police station, the officers received permission from their supervisor, Sergeant Ron Pine, to strip search the defendant. The officers ordered the defendant to remove his clothes. The defendant complied with this

---

[12] The defendant testified at the suppression hearing that he had told the officers that he was visiting his friend and identified the name of the friend. The court, however, did not credit the defendant's testimony.

[13] The record indicates that other officers had arrived at the time the defendant was placed under arrest.

order. After the defendant had removed his clothes, however, the officers noticed that he was tensing his buttocks. The officers ordered the defendant to squat down, but he refused and instead backed against a wall. After a brief struggle, the officers handcuffed the defendant and laid him on the floor. The officers then held his arms down and grabbed his legs. The defendant tensed his body, resisting the search. The officers forcibly parted the defendant's legs. Officer Terry Blake, who retrieved the drugs from the defendant's person, testified that it was at that moment that he noticed a bag protruding from the defendant's buttocks. Blake did not have to pry open the defendant's buttocks, however, to see the plastic bag or to remove it. He testified that he only had to "flick" the bag to dislodge it and that no part of the bag was in the defendant's rectum.

Section 53a-109 (a) (1) requires, for a violation thereof, that premises be either "posted," i.e., a sign be erected, or be "fenced or otherwise enclosed in a manner designed to exclude intruders . . . ." See footnote 8. There was no dispute that the premises were not "posted" in any way. The sole basis of the defendant's challenge to the probable cause of the arrest of the defendant was that because there was a gateless opening in the front concrete wall of the premises, the premises were not "fenced or otherwise enclosed in a manner designed to exclude intruders," as required for a violation of § 53a-109 (a) (1), and, therefore, the police did not have probable cause as to that element of the statute.

The court rejected the defendant's claim. Specifically, the court found that the premises were a residential, multifamily property that was fenced on all sides except for egress and ingress of cars in the parking area and had a "break in the wall in front of the building for pedestrian traffic." The court concluded that the absence of a gate was of no "legal significance" and

that the residents did not remove their property from the protection of the criminal trespass statute simply because there was no gate at the opening for pedestrian traffic. The court specifically credited the officers' testimony that the defendant had told them that he did not live at the premises and was not visiting anyone there. The court concluded, therefore, that the police had probable cause to arrest the defendant for criminal trespass in the third degree.

The court then turned to other questions raised by the search. Although the defendant had specifically disclaimed any reliance on the statutory restriction on strip searches; see footnote 9; the court nonetheless addressed that issue. The court, relying in part on this court's decision in *State* v. *Jenkins*, 82 Conn. App. 111, 842 A.2d 1148 (2004), concluded that the statute does not provide a remedy of suppression of evidence.[14] The court did not, therefore, address any other questions under the statute, and the defendant did not request that it do so.

The court did, however, address the question of the validity of a strip search under the fourth amendment pursuant to a misdemeanor arrest, concluding that such a search must be based on a reasonable and articulable suspicion that the person searched is hiding contraband on his person. The court further concluded that there was a reasonable and articulable suspicion for the search. The court based this conclusion on the following facts derived from the evidence before it: Lepore's training and experience in narcotics law enforcement; his knowledge of the defendant's prior narcotics dealings; the prior information from the confidential informant; the fact that the defendant was seen with his

---

[14] We express no opinion on whether *State* v. *Jenkins*, supra, 82 Conn. App. 111, addressed the question of whether the strip search statute embodies a suppression of evidence remedy.

hand down the back of his pants; the defendant's lie to Lepore that the defendant was tying his shoe, indicating that he was hiding contraband; the fact that he had ducked down when the police officers approached; the fact that residents had filed numerous complaints about drug dealing by nonresidents in the very courtyard where the defendant was found; and the defendant's reactions to the attempted patdown. The court also specifically found, contrary to the defendant's claim, that the search did not constitute a body cavity search under the statute. More specifically, the court credited Lepore's testimony that one half of the bag was protruding from between the defendant's buttocks, that Blake dislodged it by flicking it with his gloved finger and that there was no intrusion into any body cavity of the defendant. Accordingly, the court denied the defendant's motion to suppress.

A

The defendant first argues that the court improperly denied the motion to suppress because there was no probable cause for the arrest for criminal trespass in the third degree in violation of § 53a-109 (a) (1). The defendant renews his claim that the absence of a gate at the opening for pedestrian traffic establishes that the premises were not "fenced or otherwise enclosed in a manner designed to exclude intruders," and, therefore, as a matter of law, there was no probable cause for his arrest. We reject the restrictive reading of the statute proposed by the defendant.

An objective, reasonable person test is employed to determine whether, on the basis of the totality of the circumstances, there exists probable cause to believe that a crime had been committed. *State* v. *Jenkins,* supra, 82 Conn. App. 116. Probable cause to arrest exists if "(1) there is probable cause to believe a crime has been committed; and (2) there is probable cause to

believe that the person to be arrested committed that crime." (Internal quotation marks omitted.) *State* v. *James*, 261 Conn. 395, 418, 802 A.2d 820 (2002). "Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 293, 764 A.2d 1251 (2001). "Probable cause requires more than reasonable suspicion"; *State* v. *Dalzell*, 96 Conn. App. 515, 528, 901 A.2d 706 (2006), rev'd on other grounds, 282 Conn. 709, 924 A.2d 809 (2007); but "less than proof by a preponderance of the evidence." (Internal quotation marks omitted.) *State* v. *Clark*, supra, 293. On appeal, a court's factual findings underlying its probable cause determination are subject to review under the clearly erroneous standard. *State* v. *Jenkins*, supra, 115. We accord plenary review, however, to the determination that the facts as found amount to probable cause. See *State* v. *Rodriguez*, 239 Conn. 235, 245 n.17, 684 A.2d 1165 (1996).

The defendant's argument raises a question of statutory interpretation. We conduct a plenary review of the court's construction of the statute. See *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 231, 915 A.2d 290 (2007). Because the provision "fenced or otherwise enclosed in a manner designed to exclude intruders" is not defined, and its meaning is not plain and unambiguous, we employ the customary tools of statutory construction to determine the meaning of the provision. See *Chambers* v. *Electric Boat Corp.*, 283 Conn. 840, 845, 930 A.2d 653 (2007) (discussing statutory construction of ambiguous provisions).

We focus on the fact that the entire property was enclosed by a combination of the concrete wall and the chain-link fence, save only for the opening in the front,

which allowed pedestrian traffic to access the sidewalk by way of a set of steps. We agree with the trial court that this property was sufficiently enclosed, even with the small gateless entryway, to bring it within the protections of § 53a-109 (a) (1).

The language, "enclosed in a manner designed to exclude *intruders*," strongly suggests that the focus of the statute is on excluding those persons who would not have some legitimate and specific reason to be on the premises. Only those persons could reasonably be considered intruders. Thus, for example, in addition to residents and their visitors, delivery persons, tradespersons, door to door solicitors and the like would not be considered intruders. Those without such a legitimate purpose for being there would be considered intruders. The defendant would fall within this latter category.[15] To accept the defendant's argument would mean that for the purposes of § 53-109 (a) (1), simply because a property owner does not place a gate across an opening that is designed to let in those with legitimate reasons to be on the property, or post a sign, the property owner must be deemed also to have implicitly invited those, like the defendant, who did not have any such reason to be there.

Our interpretation, namely, that intruders are those without a legitimate reason for being on the premises, is consistent, furthermore, with the well established principle of statutory interpretation that we normally read statutes so as to form a rational and cohesive whole. See *Broadnax* v. *New Haven*, 284 Conn. 237,

---

[15] The fact that Lepore did not also ask the defendant whether he had some other purpose in being there, as the defendant suggests was necessary, is of no moment. Lepore had ample basis, because of his prior knowledge of the defendant, because of the defendant's furtive movements as the police approached, and because of the defendant's lie to him about tying his shoe, to believe that the defendant was not in the courtyard as a delivery person or other person with some specific and legitimate basis for being there.

249, 932 A.2d 1063 (2007). The statute requires that, in order for one to be a trespasser, he must be on the premises knowing that he is "not licensed or privileged" to be there. Absent a license or privilege, one does not ordinarily have the right to enter or to remain on someone else's property. Thus, we read the reference to "intruders" to incorporate the earlier reference to those who lack such a license or privilege. In short, one who does not have a license or privilege to be on someone else's property is an intruder.

The rationale for the offense of criminal trespass is to protect property, and the privacy interest inhering in that property, from unwanted intruders. *State* v. *Ward*, 83 Conn. App. 377, 385, 849 A.2d 860, cert. denied, 271 Conn. 902, 859 A.2d 566 (2004). Unfenced and unenclosed open premises, however, are not protected. *United States* v. *Breedlove*, 424 F. Sup. 2d 379, 385 (D. Conn. 2006). Furthermore, "property does not lose its private character merely because the public is generally invited to use it for designated purposes." *State* v. *Ong*, 30 Conn. App. 45, 50 n.8, 618 A.2d 583, cert. denied, 225 Conn. 909, 621 A.2d 290 (1993). Instead, "[t]he owner or one in lawful possession has the right to determine whom to invite, the scope of the invitation and the circumstances under which the invitation may be revoked." *State* v. *Steinmann*, 20 Conn. App. 599, 604, 569 A.2d 557, cert. denied, 214 Conn. 806, 573 A.2d 319 (1990). Here, the property was sufficiently enclosed so as to give reasonable notice that it was open, not to anyone for any purpose and for any length of time, but for the residents, their visitors and others with specific, legitimate reasons to be there connected to the residents. This category of invitees did not include the defendant. Indeed, the defendant does not suggest any license or privilege by which he was on the premises.

The official comments of the commission to revise the criminal statutes, which originally promulgated the

provisions, state: "Where . . . the premises are open, such as a field or lawn, the offense [occasioned by the trespass] is quite minor and technical, and the behavior not dangerous, and if the owner desires protection [from the criminal law] it is not too much to ask him to post or enclose his property." Commission to Revise the Criminal Statutes, commentary on title 53a, Connecticut Landmark Legislative Histories, pp. 54–55 (1971); Commission to Revise the Criminal Statutes, Penal Code comments, Connecticut General Statutes Annotated (West 2007) § 53a-109, p. 499. This official comment, which discusses the need to "enclose" property, compounded with the statute's use of this term "intruder," supports our conclusion that a property owner does not take himself out of the protection of the criminal trespass statute simply by failing to place a gate at, or post a sign on, an entrance to an otherwise completely enclosed parcel of property.

Therefore, we conclude that the statute does not demand that premises be completely enclosed to fall within its purview, but they must be enclosed sufficiently to exclude intruders, namely, those who purposefully enter the property despite having no legitimate reason to do so. The premises here were surrounded on three sides by a chain-link fence, and the fourth side featured a five foot high cement wall that could be accessed only by going up steps. We conclude that this was sufficient, even with the gateless opening to permit pedestrian ingress and egress, to bring the premises within the protection of the statute. Because the defendant's sole challenge to his arrest was that, as a matter of law, the property was not within the protection of the statute, we agree with the court that the warrantless arrest of the defendant was lawful.

The dissent inaccurately presents the case as involving the intersection of the right to freedom of movement, on the basis of the right to interstate travel, and

the rights inherent in the ownership of private property. There is, however, no right of freedom of movement to enter someone else's property absent some license or privilege to do so, as the dissent acknowledges. Our common expectations and our common sense, as well as our criminal law, recognize this. Thus, we fail to see how this case presents, as the dissent asserts, any "intersection of *two* fundamental rights: the right to freedom of movement and the right to the private enjoyment of one's own property." (Emphasis added.) In our opinion, there is only one fundamental right involved here: the right of a private owner to the protection of § 53a-109 (a) (1) to enjoy his property and to exclude intruders. Under the dissent's interpretation of § 53a-109 (a) (1), however, a property owner who has enclosed his property completely save for a limited opening to permit ingress and egress of persons with the right to be there, must, in order to keep out drug dealers like the defendant, post a no trespassing sign or install a locked gate. We do not believe that the legislature intended the statute at issue to afford such restricted protection to property owners.

The dissent also places too much emphasis on one dictionary definition of the word "enclose" as meaning "[t]o surround or encompass; to fence or hem in on *all* sides." (Emphasis added in dissenting opinion.) First, a dictionary does not give *the* definition or *the* common meaning of a word; it simply gives a list of all of the meanings that have been attributed to the word in the English language, depending on the contexts in which the word has been used; see *Northrop* v. *Allstate Ins. Co.*, 247 Conn. 242, 250, 720 A.2d 879 (1998); and its meaning in a statute must be determined by, among other things, its context, including the words surrounding it. Here, the word "enclosed" is not used in isolation; it is followed by "in a manner designed to exclude intruders." Its meaning must be determined

with reference to its use as part of that phrase. Finally, even if we were to adopt the dictionary definition relied on by the dissent, here the property *is* enclosed because it is surrounded on all sides by a cement wall and metal fencing, and, despite the dissent's insistence, the phrase "enclosed in a manner designed to exclude intruders" does not unambiguously exclude a gateless opening obviously designed to permit only those with appropriate licenses or privileges to enter.

B

The defendant next argues that the strip search violated various sections of the strip search statutes; §§ 54-33k and 54-33*l* (a); see footnote 9; and his fourth amendment rights because the police, in his view, were acting on a mere hunch that drugs were hidden on his person. To the extent that the defendant challenges the search pursuant to §§ 54-33k and 54-33*l* (a), we decline to review his challenge because he specifically disclaimed reliance on those provisions in the trial court,[16] and the court addressed his strip search claim only under the fourth amendment. Furthermore, the defendant cannot prevail on this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because the challenge is statutory in nature, not constitutional.

We reject his argument under the fourth amendment that the police searched him on the basis of no more than a hunch. We agree with the court and the state that, although ordinarily a search incident to a valid arrest is an exception to the warrant requirement, a warrantless strip search pursuant to a misdemeanor arrest requires more, namely, a reasonable and articulable suspicion that the defendant is carrying contraband or a weapon. See *State* v. *Jenkins*, supra, 82 Conn. App.

---

[16] We therefore need not address the defendant's contention under his claim that the term "reasonable belief," as used in the strip search statute, requires a higher degree of belief than a reasonable and articulable suspicion.

122–23; see also *State* v. *Nieves*, 383 Md. 573, 861 A.2d 62 (2004) (en banc) (collecting cases); *Flores* v. *Mount Vernon*, 41 F. Sup. 2d 439 (S.D.N.Y. 1999).

The police had more than ample evidence from which to form a reasonable and articulable suspicion that the defendant was carrying contraband. The police had previously received reports that there was ongoing drug activity at the location. One of the officers, Lepore, recognized both the defendant and his companion from previous drug related arrests. When the defendant noticed the officers approaching the premises, the officers observed the defendant duck down behind the wall separating the courtyard from the adjoining sidewalk. When the officers entered the courtyard, they saw the defendant squatting down on the ground with his hand down the back of his pants, fiddling with something. Lepore knew, from his experience, that drug dealers often hide illegal drugs down their pants and between the cheeks of their buttocks to evade detection. Further, when the officers asked the defendant why he was squatting down, the defendant provided an answer, tying his shoes, that the officers reasonably believed to be a lie. The defendant told the officers that he neither lived at the property nor was he visiting anyone. When Lepore conducted a patdown search of the defendant, the defendant urgently resisted when Lepore attempted to pat down the seat of the defendant's pants. Finally, during the strip search at the police station, the defendant's conduct, namely, tensing his buttocks, refusing to squat down, backing against a wall and resisting the officers' attempt to spread his legs, was consistent with an attempt to hide contraband between his buttocks.

C

The defendant's final challenge to the court's ruling on his suppression motion is that the court improperly

found that the search did not constitute a body cavity search pursuant to § 54-33*l* (b). We disagree.

This argument has two aspects. The first, legal aspect is the question of what constitutes a "search of any body cavity" within the meaning of the statute. The second, factual aspect is whether, applying that legal standard, the court's factual finding was clearly erroneous. General Statutes § 54-33*l* (b) provides: "No search of any body cavity other than the mouth shall be conducted without a search warrant. Any warrant authorizing a body cavity search shall specify that the search is required to be performed under sanitary conditions and conducted either by or under the supervision of a person licensed to practice medicine in accordance with chapter 370."

Although § 54-33*l* (b) does not define "search of any body cavity," we agree with the court that, as applied to this case, a body cavity search under the statute requires that the police actually have physically intruded into the defendant's anus in order to retrieve the contraband. Unlike § 54-33*l* (b), which uses but does not define the term "body cavity search," § 54-33k does define the term "strip search," insofar as that definition applies to the facts of this case, as "a visual inspection of the . . . buttocks [or] anus . . . ." The language of § 54-33*l* suggests that a "strip search" and a "body cavity search" are two discrete searches under the provisions of the statute and that, therefore, when a search constitutes a "strip search," it does not, pursuant to the statute, necessarily amount to a "body cavity search." Although the two types of searches appear within the same statutory provision, the two terms are used independently of each other.

First, there are two different standards of proof required by § 54-33*l* for the two types of searches. Section 54-33*l* (a) requires that the standard of proof necessary before conducting a "strip search" pursuant to a

misdemeanor arrest is a "reasonable belief." Section 54-33*l* (b), however, provides that "[n]o search of any body cavity . . . shall be conducted without a search warrant," suggesting that the appropriate standard of proof is probable cause to believe the body cavity search is necessary. Second, the statutory procedures prescribed for conducting strip searches and body cavity searches are different and, at least in part, mutually exclusive. Section 54-33*l* (d) provides in relevant part that "[a]ny peace officer . . . conducting a strip search shall (1) obtain the written permission of the police chief" before conducting the search. Section 54-33*l* (b), in contrast, provides that "the [body cavity] search is required to be . . . conducted either by or under the supervision of a person licensed to practice medicine in accordance with chapter 370." This suggests that a "peace officer," unless he also happens to be licensed to practice medicine or under the supervision of one so licensed, may not conduct a body cavity search at all. Having concluded that the statutory provisions create two independent types of searches, namely, strip and body cavity, and that the definition of a strip search is meant, among other things, to indicate what is not a body cavity search, we further conclude from the language contained in the definition of a strip search, that merely visually inspecting the buttocks or anus, which constitutes a strip search, is not sufficient to constitute a body cavity search under § 54-33*l* (b) and that, as the court determined, a body cavity search requires a physical intrusion into the anus. This conclusion is buttressed by reference to the legislative history of § 54-33*l*. Representative Richard D. Tulisano, who introduced the provision, commented that a body cavity search will "reveal" the "inside [of] the cavit[y] of [an] individual." 23 H.R. Proc., Pt. 4, 1980 Sess., p. 1132.

As a factual matter, the court credited the testimony of the police officers that they dislodged the bag of

contraband, which protruded from between the defendant's buttocks, by flicking it with a finger and that the bag was wholly outside of the defendant's rectum. There was ample evidence to sustain the court's finding.

## II

The defendant's second claim is that his conviction of possession of narcotics by a person who is not drug-dependent, under § 21a-278 (a), must be reversed in light of the decision of the United States Supreme Court in *Apprendi* v. *New Jersey*, supra, 530 U.S. 466. We reject his claim.

In *Apprendi*, the court declared that under the due process clause of the United States constitution, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" by the state. Id., 490.

As the state points out, and as the defendant acknowledges, this court has already addressed and rejected this argument in *State* v. *Walker*, 90 Conn. App. 737, 881 A.2d 406, cert. denied, 275 Conn. 930, 883 A.2d 1252 (2005). *Walker* relied on our Supreme Court's decision in *State* v. *Hart*, 221 Conn. 595, 605 A.2d 1366 (1992), for the proposition that under our statutory drug offense scheme, the fact that the defendant is drug-dependent is an affirmative defense on which the defendant has the burden of persuasion by a preponderance of the evidence. Therefore, we held in *Walker* that placing the burden of persuasion on the defendant to prove his drug dependency, which operates to *reduce*, not *increase*, the sentence to which he would otherwise be subject, does not violate the proscriptions of *Apprendi*. *State* v. *Walker*, supra, 742.

The gist of the defendant's claim is that both *Hart* and *Walker* were wrongly decided and should be overruled. He does not claim, however, that in *Walker* we

misread *Hart*. We decline the defendant's invitation to overrule these two precedents.

First, as an intermediate appellate court, it is beyond our function to overrule controlling Connecticut Supreme Court precedent. *Sastrom* v. *Psychiatric Security Review Board*, 100 Conn. App. 212, 219 n.4, 918 A.2d 902, cert. granted on other grounds, 282 Conn. 920, 925 A.2d 1101 (2007). Therefore, we decline even to consider whether *Hart* was wrongly decided. Second, because *Walker* relies for its analysis on *Hart*, it, too, is insulated from being overruled. See also *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 285 n.20, 873 A.2d 208 (noting this court's policy that precedent set by one panel of this court generally should be overruled only after en banc hearing), cert. denied, 275 Conn. 905, 882 A.2d 668 (2005).

The judgment is affirmed.

In this opinion FLYNN, C. J., concurred.

BISHOP, J., dissenting. Although I agree with my colleagues in the majority that once the police took the defendant, Kevin Robinson, into custody, they had the right to search him as they did, I do not believe that the police had probable cause to arrest the defendant for criminal trespass in the third degree in violation of General Statutes § 53a-109 (a) (1). Because, in my view, the police were not entitled to take the defendant into custody, I believe that the motion to suppress should have been granted, and, accordingly, I would reverse the judgment of the trial court.

Generally, trespass statutes implicate the intersection of two fundamental rights: the right to freedom of movement and the right to the private enjoyment of one's own property. In describing the fundamental freedom to move about, the United States Court of Appeals

for the Second Circuit has opined: "[I]t would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." *King* v. *New Rochelle Municipal Housing Authority*, 442 F.2d 646, 648 (2d Cir.), cert. denied, 404 U.S. 863, 92 S. Ct. 113, 30 L. Ed. 2d 107 (1971); see also *Ramos* v. *Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) (holding that because curfew laws impinge on a minor's freedom of movement, they are subject to intermediate scrutiny). Although the United States Supreme Court has not directly addressed this issue, in speaking of the right of interstate travel, the highest court has stated: "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Smith* v. *Turner*, 48 U.S. 283, 492, 12 L. Ed. 702 (1849). The right of intrastate travel has similarly been characterized as fundamental. Recently, the Ohio Supreme Court recognized this right in a case involving a municipal ordinance that limited access to a certain area of town known for drug trafficking. The court commented: "[T]he right of intrastate travel we contemplate is the right to travel locally through public spaces and roadways of this state. Historically, it is beyond contention that being able to travel innocently throughout the country has been an aspect of our national freedom. Likewise, the right to travel within a state is no less fundamental than the right to travel between the states. Every citizen of this state much like the citizens of this Nation, enjoys the freedom of mobility not only to cross our borders into our sister states, but also to roam about innocently in the wide-open spaces of our state parks or through the streets and sidewalks of our most

populous cities." *State* v. *Burnett*, 93 Ohio St. 3d 419, 428, 755 N.E.2d 857 (2001).

This right to travel, or freedom of movement, however, does not trump a property owner's right to the private use of his or her property. The right to exclude others has been held to constitute a fundamental element of private property ownership. See *Kaiser Aetna* v. *United States*, 444 U.S. 164, 100 S. Ct. 383, 62 L. Ed. 2d 332 (1979). "One of the main rights attaching to property is the right to exclude others . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." (Citation omitted; internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 94 n.19, 675 A.2d 866 (1996). Thus, there is no constitutionally protected freedom of movement on private property. See *State* v. *Steinmann*, 20 Conn. App. 599, 569 A.2d 557, cert. denied, 214 Conn. 806, 573 A.2d 319 (1990).

Our statutory scheme regarding trespass appears to recognize this intersection of rights. Criminal trespass statutes in Connecticut permit a property owner to deny public access either by words, signs or physical configuration, and for one to be guilty of any form of trespass, one must knowingly be a trespasser. None of our trespass statutes imposes strict liability; that is, an unknowing intruder is not a trespasser. Thus, in order to be found guilty of criminal trespass in the first degree in violation of General Statutes § 53a-107,[1] criminal tres-

---

[1] General Statutes § 53a-107 (a) provides: "A person is guilty of criminal trespass in the first degree when: (1) Knowing that such person is not licensed or privileged to do so, such person enters or remains in a building or any other premises after an order to leave or not to enter personally communicated to such person by the owner of the premises or other authorized person; or (2) such person enters or remains in a building or any other premises in violation of a restraining order issued pursuant to section 46b-15 or a protective order issued pursuant to section 46b-38c, 54-1k or 54-82r by the Superior Court; or (3) such person enters or remains in a building or any other premises in violation of a foreign order of protection, as defined

pass in the second degree in violation of General Statutes § 53a-108,[2] criminal trespass in the third degree in violation of § 53a-109[3] or simple trespass in violation of General Statutes § 53a-110a,[4] a defendant must be found to have been on another's property with the knowledge that he or she is not licensed or privileged to do so. The varying degrees of culpability set forth in the criminal trespass statutes are dependent on three factors: guilty knowledge of the intruder, the type of property on or in which the trespass occurs and the extent to which the property owner has made plain his or her desire to exclude the uninvited from his or her property. Accordingly, in order to be guilty of criminal trespass in the first degree, one must not only be in a building or on premises where one knows he or she is not licensed or privileged to be, but one must also be explicitly told not to be on the premises. Thus, the property owner may shape the degree of an intruder's

in section 46b-15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person; or (4) knowing that such person is not licensed or privileged to do so, such person enters or remains on public land after an order to leave or not to enter personally communicated to such person by an authorized official of the state or a municipality, as the case may be."

[2] General Statutes § 53a-108 (a) provides: "A person is guilty of criminal trespass in the second degree when, knowing that such person is not licensed or privileged to do so, (1) such person enters or remains in a building, or (2) such person enters or remains on public land."

[3] General Statutes § 53a-109 (a) provides: "A person is guilty of criminal trespass in the third degree when, knowing that such person is not licensed or privileged to do so: (1) Such person enters or remains in premises which are posted in a manner prescribed by law or reasonably likely to come to the attention of intruders or are fenced or otherwise enclosed in a manner designed to exclude intruders, or which belong to the state and are appurtenant to any state institution; or (2) such person enters or remains in any premises for the purpose of hunting, trapping or fishing; or (3) such person enters or remains on public land which is posted in a manner prescribed by law or reasonably likely to come to the attention of intruders or is fenced or otherwise enclosed in a manner designed to exclude intruders."

[4] General Statutes § 53a-110a (a) provides: "A person is guilty of simple trespass when, knowing that he is not licensed or privileged to do so, he enters any premises without intent to harm any property."

culpability by his or her action in ordering the trespasser to leave or not to enter the property. Because the trespasser has been explicitly informed of his or her lack of license to be on the property, the criminal culpability is at its highest. The next level of culpability, criminal trespass in the second degree requires proof that one enters or remains in a building or public land that one knows he or she has no right to enter. A step lower in culpability, criminal trespass in the third degree is committed by one who, knowing that he or she is not licensed or privileged to do so, enters or remains in premises that have been "posted in a manner prescribed by law or reasonably likely to come to the attention of intruders or are fenced or otherwise enclosed in a manner designed to exclude intruders, or which belong to the state and are appurtenant to any state institution . . . ." General Statutes § 53a-109 (a). To be culpable under this statute, an intruder must not only have guilty knowledge regarding his or her presence on the property, but the property owner must have taken certain measures to exclude intruders either by the posting of appropriate signage or by enclosing the property. Finally, in accord with the simple trespass statute, the least culpable intruder is one who goes or remains on private property knowing he or she is not permitted to do so. It is noteworthy that even this mildest of trespasses requires guilty knowledge.

The present case requires an examination of § 53a-109, criminal trespass in the third degree. It is undisputed that the subject premises were not posted in a manner reasonably likely to come to the attention of intruders. Thus, in order for there to be criminal liability pursuant to § 53a-109, the premises must have been "fenced or otherwise enclosed in a manner designed to exclude intruders." It is in the interpretation of this statute that I part company with the majority.

It is well to remember that because § 53a-109 is a penal statute, it is to be strictly construed. "[C]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . [U]nless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." (Internal quotation marks omitted.) *State* v. *Strich*, 99 Conn. App. 611, 633, 915 A.2d 891, cert. denied, 282 Conn. 907, 920 A.2d 310, cert. denied, 552 U.S. 901, 128 S. Ct. 225, 169 L. Ed. 2d 171 (2007).

I recognize, as well, that in strictly construing a statute we do not discard common sense. This means that "[i]n the interpretation of statutory provisions . . . the application of common sense to the language is not to be excluded. . . . Thus, [e]ven applying the view that a penal statute should be strictly construed, the words of a statute are to be construed with common sense and according to the commonly approved usage of the language." (Internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 551–52, 821 A.2d 247 (2003).

Contrary to the opinion of my colleagues, I believe that the language of § 53a-109 is clear and unambiguous, and the strict application of its terms does not defy common sense. Because the word "enclosed" is not defined statutorily, we turn to General Statutes § 1-1 (a), which provides in relevant part: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . ." To ascertain that usage, we look to the dictionary definition of the term. See *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 498, 923 A.2d 657 (2007). "Enclose" is defined as: "To surround or encompass; to fence or hem in on *all* sides." (Emphasis added.) Black's Law Dictionary (8th Ed. 2004). The terms "exclude" and "intruder" also have readily defined plain

meanings. The term "exclude" means "to shut out: restrain or hinder the admission of . . . ." Webster's Third New International Dictionary. Finally, the term "intruder" is defined as one who "enters, remains on, uses, or touches land or chattels in another's possession without the possessor's consent." Black's Law Dictionary, supra.

As noted by the majority, the facts found by the trial court in this regard are that 75 South Main Street in Norwalk consists of a parcel on which is located a multifamily residence fronted by a courtyard and backed by a parking lot. Looking at the premises from the South Main Street vantage point, there is a stone wall approximately four feet in height that runs between the courtyard and the street. In the approximate middle of this wall, there is a break, which is the entryway for persons entering and departing the property from South Main Street. This entryway is not gated. On both sides of the property and approximately perpendicular to the stone wall are chain-link fences that run to the rear of the property. It is unclear from the record whether the chain-link fences are joined by a fence running along the rear of the property, but in any case, there is no evidence that entrance to the property via the parking lot by vehicles or pedestrians is limited by a gate or any other means of exclusion. In my view, the property is not enclosed; it is partially enclosed. To the extent that it is partially enclosed, it is not enclosed in a manner designed to exclude intruders because the partial closures affect those who live on the premises to the same extent as those who do not live there.

My colleagues in the majority conclude that the arrest was proper because the defendant clearly knew that he did not belong on the premises. The majority reaches that conclusion on the basis of the defendant's behavior as well as the physical characteristics of the property. The defendant was first seen by the police standing in

the front courtyard with a woman. The police recognized the defendant as a street level drug dealer and the woman as a prostitute. As the defendant saw the police, he bent down behind the stone wall and placed his hand toward the rear of his pants. When asked by the police whether he lived on the premises or was visiting a resident, he responded in the negative. On this basis, the police arrested the defendant for the crime of attempt to commit trespass in the third degree and took him into custody. Although this may have been sufficient to impute knowledge to the defendant that he did not have license to be on the premises, this conclusion relates only to the guilty knowledge portion of § 53a-109 and not to that portion of the statute that relates to actions the property owner is entitled to take to protect against intrusion.

The majority concludes that the property was enclosed in a manner designed to exclude intruders. By doing so, it imports into the word "enclose" the notion of a partial or incomplete enclosure. It contends that reading the statute to require complete enclosure would be hypertechnical and would mandate that property owners would have to enclose their property completely in order to give fair notice to intruders that they are unwelcome. Respectfully, I believe that the statute does, by its plain language, require property owners to enclose their property, or, in the alternative, to place signage in a manner reasonably likely to come to the attention of intruders. It is precisely these requirements—that the property owner either place signage or enclose the property—that determine the level of culpability of a knowing trespasser.

In sum, although I agree that the partial enclosure of the property in question may serve to indicate to members of the public that the property is private, to interpret the phrase "fenced or otherwise enclosed in a manner designed to exclude intruders" as requiring

only a partial enclosure denies the language of the statute its common meaning. Furthermore, I do not believe that a strict reading of the language of the statute renders it unworkable or absurd in requiring a property owner to completely enclose property to exclude others physically. This can readily be accomplished by the installation of a gate with a mechanical or electronic locking device making the property accessible only to residents of the property and their guests.

In the factual scenario at hand, even if I were to accept the notion that the partial girding of the premises with a broken wall and incomplete fence represents an enclosure, the open access to the courtyard and to the parking lot cannot be said to represent an enclosure designed to exclude intruders. In fact, these openings have no greater impact on residents than on nonresidents and serve only to funnel traffic to two points of entry and departure. Therefore, because both residents and nonresidents have equal access through the entryway into the parking lot and to the stairs leading to an open courtyard in front of the building facing South Main Street, and because the wall and fencing are obstacles equally to residents of the multifamily dwelling and to members of the public, it cannot be said that any enclosure of the premises is designed to exclude intruders.

If we assume arguendo that the police had probable cause to believe that the defendant knew that he did not belong in the courtyard, the police may have had a basis to issue a citation to the defendant for the infraction of simple trespass in violation of § 53a-110a. Because the police are prohibited, however, from taking into custody one who is cited only for an infraction,[5]

---

[5] Practice Book § 44-23 (b) provides: "Any resident of the state of Connecticut who is charged with an infraction or violation payable by mail pursuant to statute, and any resident of a state that is a signatory with Connecticut of a no-bail compact who is charged with an infraction involving a motor vehicle or with a violation of General Statutes § 14-219 (e), shall not be

and because the incriminating evidence in this case was seized as a result of a custodial search undertaken after the defendant was improperly taken into custody, I believe that the motion to suppress should have been granted and the judgment should be reversed. Accordingly, I respectfully dissent.

taken into custody, but shall be issued a summons and complaint and follow the procedure set forth in Sections 44-25 through 44-27."