**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MARK TYRELL FOWLKES, AKA
Mark Fowlkes, AKA Marq Tyrell
Fowlkes, AKA Shawn Walls,
*Defendant-Appellant*.

No. 11-50273

D.C. No.
2:07-cr-00497-
CAS-1

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
May 7, 2013—Pasadena, California

Filed September 28, 2015

Before: Kim McLane Wardlaw and Mary H. Murguia,
Circuit Judges, and Jane A. Restani, Judge.[*]

Opinion by Judge Wardlaw;
Partial Dissent by Judge Restani

---

[*] The Honorable Jane A. Restani, Judge for the U.S. Court of
International Trade, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel granted a petition for panel rehearing, withdrew an opinion and partial dissent filed August 25, 2014, and filed a new opinion and partial dissent in an appeal from a conviction for drug distribution and possession with intent to distribute.

The panel affirmed in part and reversed in part – vacating a conviction on a count predicated on drugs unconstitutionally seized from the defendant's body cavity, and remanding for resentencing.

The panel held that the forcible removal of an unidentified item of unknown size from the defendant's rectum during a body cavity search at the Long Beach City Jail, without medical training or a warrant, violated the defendant's Fourth Amendment rights, and that the evidence obtained from this brutal and physically invasive seizure should have been suppressed.

The panel affirmed the district court's denial of the defendant's motions to suppress evidence obtained through wiretaps, to suppress evidence seized from his apartment, to suppress cocaine base and marijuana seized from his car, to dismiss the indictment on a claim of evidence tampering, and to dismiss the indictment on double jeopardy grounds following a mistrial.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting in part, Court of International Trade Judge Restani disagreed with the majority's decision to suppress the evidence seized during the jailhouse search because she believes the facts found by the district court render the warrantless search and seizure reasonable under the totality of the circumstances.

## COUNSEL

Thomas P. Sleisenger (argued), Law Offices of Thomas P. Sleisenger, Los Angeles, California, for Defendant-Appellant.

Cheryl L. O'Connor (argued) and Kevin S. Rosenberg, Assistant United States Attorneys; Robert E. Dugdale, Chief, Criminal Division; and André Birotte Jr., United States Attorney, Office of the United States Attorney, Los Angeles, California, for Plaintiff-Appellee.

## ORDER

Appellee's January 22, 2015 Petition for Panel Rehearing is **GRANTED**. Accordingly, the Opinion and Partial Dissent filed on August 25, 2014 are withdrawn, and a new opinion and partial dissent are filed. *See* Fed. R. App. P. 40(a)(4)(A).

## OPINION

WARDLAW, Circuit Judge:

Mark Tyrell Fowlkes appeals his conviction for drug distribution and possession with intent to distribute. Fowlkes raises a number of claims on appeal, but only one has merit: that the forcible removal of an unidentified item of unknown size from Fowlkes' rectum by officers without medical training or a warrant violated his Fourth Amendment rights. Because we conclude that the evidence obtained from this brutal and physically invasive seizure should have been suppressed, we vacate Fowlkes' conviction in part, vacate his sentence, and remand to the district court.

### I.

### A.

Drug Enforcement Administration ("DEA") agents and Long Beach Police Department ("LBPD") officers obtained warrants for wiretaps on two phones (Target Telephones #1 and #2) in July and August of 2006. On September 3, 2006, officers intercepted communications pursuant to the wiretap, which led them to conclude that Fowlkes was arranging a drug deal. Based on that information, LBPD officers placed Fowlkes under surveillance and witnessed what appeared to be a drug deal between Fowlkes and two other individuals, Shaun Lee and Elaine Watson. Lee walked away from the deal, but officers stopped him and found he possessed 0.61 grams of crack cocaine.

On September 4, 2006, the LBPD and DEA intercepted several more phone calls, leading them to conclude that

Fowlkes was planning to destroy or remove contraband from his apartment. Within an hour of the last phone call, officers arrived at the apartment. Upon entry, they saw Fowlkes and another individual, Latoya Marshall, as well as a 9mm handgun. The officers handcuffed Fowlkes and Marshall and conducted a protective sweep of the apartment. After securing a warrant, officers searched the apartment and found approximately 2.6 grams of crack cocaine, a digital scale, and the loaded 9mm handgun. Fowlkes was subsequently released from police custody.

On September 13, 2006, after witnessing what appeared to be a narcotics transaction between Fowlkes and an unidentified man, LBPD officers requested that a marked car execute a pretextual traffic stop. Pulled over for an expired registration, Fowlkes and his passenger were asked to exit the vehicle. Fowlkes denied consent to search the car. Asserting that they saw marijuana in the open side panel of the car and a substance they believed was cocaine base on the front seats of the car, officers arrested Fowlkes for felony drug possession and transported him to the Long Beach City Jail for processing.

At intake, the officers strip searched Fowlkes in the jail's strip search room, a five by six enclosure with three concrete walls and an opening in the fourth wall. Five officers observed the strip search, including Officer Jeffrey Harris and Sergeant Michael Gibbs, who brought along his taser, gloves and "assistance" in the form of additional officers because he thought Fowlkes might have drugs. The officers instructed Fowlkes to remove his clothing and face the far wall as they watched him. Fowlkes was instructed to bend over, spread his buttocks, and cough, but according to Sergeant Gibbs, Fowlkes instead moved his hand toward his right buttock.

Instructed to repeat the procedure, Fowlkes made a quick movement to his buttocks area with his hand and appeared to Gibbs "to be forcing or forcibly pushing an item inward." Officer Harris testified that he believed it was possible Fowlkes was attempting to push something into his anus. However, he did not actually see any object Fowlkes could have been pushing, and he acknowledged that there was no other way for Fowlkes to comply with the directive other than by reaching back and putting his fingers towards his anus. For his part, Sergeant Gibbs testified that he saw an object protruding from Fowlkes' anus and that he believed Fowlkes appeared "to be forcing or moving an object or further secreting an object" inside his rectum to destroy evidence.

To prevent that, Gibbs "delivered a drive stun tase to the center portion of the defendant's back." Fowlkes' arms went straight into the air, and the officers handcuffed him. Fowlkes began to "squirm[]" and "struggl[e]," and the officers "lean[ed] him against the wall, . . . brace[d] his body up against the wall" so that "[h]e end[ed] up being bent over." With Fowlkes in this position, the officers testified that they could see what appeared to be a plastic bag partially protruding from Fowlkes' rectum.

Officers continued to "brac[e] [Fowlkes] up against the wall" to prevent him from resisting. At this point, Fowlkes was handcuffed and incapacitated by five male officers. Fowlkes had no ability to destroy or further secrete what was in the plastic bag. Neither Sergeant Gibbs nor the other officers could tell what, if anything, the plastic bag contained while it remained in Fowlkes' rectum. Nor could they determine how large it was or how far it extended into Fowlkes' body. Despite this, and despite the fact that none of the officers had any relevant medical training, the officers did

not attempt to obtain a warrant, summon medical personnel, move Fowlkes to a sanitary location, or allow Fowlkes to pass the suspected contraband naturally. Instead, Sergeant Gibbs forcibly "retrieved" the bag. He put on the protective gloves he had brought along to the "search" and pulled the object from Fowlkes' rectum without the assistance of anesthesia, lubricant, or medical dilation. Sergeant Gibbs testified that he was able to remove the object using his thumb and index finger without penetrating Fowlkes' anal cavity. Officer Harris testified that the removal itself was a difficult, abrasive procedure:

> I watched the entire process of him removing it in his fingers. [The object] went from a dime size to a penny size to a nickel size to a quarter size to somewhat near a golf ball size as it was taken out.

Officer Harris further testified that he could "see blood and what looked to be feces" on the plastic bag after it had been removed. Photographs of the object that are included in the appellate record confirm that the object was covered in blood.

## B.

On June 6, 2008, the government filed an indictment charging Fowlkes with three counts of drug possession and distribution and two related firearm counts. Before trial, Fowlkes moved to suppress all of the evidence obtained in the case pursuant to the wiretap, the evidence seized from the searches of his apartment and car, and the drugs found within his person during the body cavity search at the jail. The district court denied each of these motions.

On July 8, 2008, a jury trial commenced, but it ended two days later when Fowlkes requested a mistrial after Federal Marshals arrested a key defense witness outside of the courtroom doors, but within earshot and possible view of the jury. Fowlkes subsequently filed a motion to dismiss the indictments on double jeopardy or due process grounds because the government's misconduct had goaded him into requesting the mistrial. On September 17, 2008, the district court denied the motion.

On November 4, 2008, Fowlkes' retrial began, and on November 20, the jury found Fowlkes guilty of the three drug-related counts. The court sentenced Fowlkes to time served (forty-six months) and supervised release for eight years.

Fowlkes claims the district court erred by denying his motions to: (1) suppress the evidence obtained through the wiretaps because the application for the warrant was technically deficient, and, at the least, the district court should have held a *Franks* hearing; (2) suppress evidence seized from his apartment because the officers' warrantless entry was unlawful and the warrant authorizing the search was unsupported by probable cause; (3) suppress the cocaine base and marijuana seized from his car because the initial stop and subsequent search of his car was unlawful; (4) suppress the evidence extracted from his rectum at the jail because this evidence was retrieved in an unreasonable manner, in violation of his Fourth Amendment rights; (5) dismiss the indictment on a claim of evidence tampering;[1] and (6) dismiss

---

[1] Because the evidence found within Fowlkes' body was seized in an unreasonable manner and thus should have been suppressed, we need not

the indictment on double jeopardy grounds following a mistrial.

We affirm the district court's rulings except the denial of Fowlkes' motion to suppress the cocaine seized from within his body at the Long Beach City Jail. We therefore reverse the conviction on the count predicated on that evidence.

## II.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). We review de novo a district court's denial of a motion to suppress evidence, and we review the underlying factual issues for clear error. *United States v. Fernandez*, 388 F.3d 1199, 1234 (9th Cir. 2004). The district court concluded that a warrant was not required for the drugs forcibly removed from Fowlkes' rectum, reasoning that the officers conducted a visual search rather than a physical one. While it may be true that the *search* was purely visual, the *seizure* of contraband discovered during that search was clearly physical. Based on the particular circumstances of the seizure at issue, we conclude that the officers acted unreasonably and the evidence they seized therefore should have been suppressed.

## A.

The LBPD's warrantless visual strip search of Fowlkes during the jail intake process was not unreasonable. The government has a strong interest in preventing contraband

_____

resolve Fowlkes' other allegations of discovery violations or chain of custody issues pertaining to that evidence.

from entering its prisons and jails, and in the jail intake process, we have recognized that "adherence to the warrant-and-probable cause requirement would be impracticable." *Friedman v. Boucher*, 580 F.3d 847, 853, 858 (9th Cir. 2009) (internal quotation marks omitted). Specifically, in *Bull v. City and County of San Francisco*, we addressed whether suspicionless *visual* body cavity searches may be performed without a warrant during the jail intake process. 595 F.3d 964, 968–69 (9th Cir. 2010) (en banc). Answering this question in the affirmative, we relied primarily on two factors to conclude that it would be impracticable for the government to obtain a warrant prior to each individual search. First, we looked to the sheer number of individuals the San Francisco Sheriff's Department intakes annually: "50,000 individuals are booked and processed each year." *Id.* at 966. Given these large numbers, it would be difficult, if not impossible, for the San Francisco Sheriff's Department to obtain a warrant prior to performing every individual visual cavity search. Second, we observed that visual cavity searches are often suspicionless; rather than justified by probable cause, they are necessary by virtue of the jail's security concerns. *See id.* at 966–67.

Similarly, in *Florence v. Board of Chosen Freeholders*, 132 S. Ct. 1510 (2012), the Supreme Court upheld a blanket strip search and *visual* body cavity search for arrestees entering detention facilities based on the same impracticability rationale that we applied in *Bull*. The Court considered, for example, that the Essex County Correctional Facility intakes more than 25,000 inmates each year, *id.* at 1514, and that it would be very difficult practically to identify or sort those detainees who should be searched because they are more likely to be carrying contraband from those who should not be searched, *id.* at 1520–22. The Court also

explicitly noted: "There are no allegations that the detainees here were touched in any way as part of the searches." *Id.* at 1515.

By contrast, searches that require intrusion into a person's body implicate greater constitutional concerns. *See Bouse v. Bussey*, 573 F.2d 548, 550 (9th Cir. 1977) (per curiam) (quoting *Schmerber v. California*, 384 U.S. 757, 770 (1966) ("Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned.")). An intrusion into the human body implicates an individual's "most personal and deep-rooted expectations of privacy." *Winston v. Lee*, 470 U.S. 753, 760 (1985). Therefore, while visual cavity searches that do not require physical entry into a prisoner's body are generally permissible without a warrant during the jail intake process, physical cavity searches generally are not. *See Schmerber*, 384 U.S. at 769–70 ("The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained.").

Here, the LBPD officers went beyond the visual cavity search found reasonable in *Bull*. They seized an unidentified object of unknown size from Fowlkes' rectum, subjecting him to a physically invasive, painful experience and thereby implicating his "most personal and deep-rooted expectations of privacy." *Lee*, 470 U.S. at 760. At the same time, however, the officers, while acting without a warrant and engaging in physical contact, were not acting "on the mere chance that desired evidence might be obtained." *Schmerber*, 384 U.S. at 770. They had reason to believe desired evidence was located inside of Fowlkes' body because Sergeant Gibbs

could see a portion of an object which he thought Fowlkes was attempting to further secrete. Thus, they conducted a warrantless physical *seizure* of contraband they actually observed during the course of a permissible warrantless visual search.

## B.

Having properly framed the officers' conduct as a warrantless, physically invasive seizure of actual (not merely suspected) contraband, we must determine whether that conduct was unreasonable under the Fourth Amendment. We conclude that it was.

In reaching this conclusion, we need not and do not determine whether a warrant is required to seize evidence discovered during a visual strip search from an inmate's body because the officers' conduct here was unreasonable for other reasons. As the Supreme Court recently reiterated, "[e]ven if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution." *Maryland v. King*, 133 S. Ct. 1958, 1970 (2013); *see also Bull*, 595 F.3d at 967 n.2 ("There is no doubt . . . that 'on occasion a security guard may conduct the search in an abusive fashion, and [s]uch an abuse cannot be condoned.'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 560 (1979))). We have applied the same principle in analyzing the constitutionality of a seizure in a nearly identical context involving extraction of evidence from a suspect's rectum. *See United States v. Cameron*, 538 F.2d 254, 258 (9th Cir. 1976) ("[A] clear indication that the suspect is concealing contraband does not authorize government officials to resort to any and all means at their disposal to retrieve it."); *see also United States v. Edwards*,

666 F.3d 877, 884 (4th Cir. 2011) ("The manner in which contraband is removed from a suspect during a sexually intrusive search, no less than the manner in which the contraband initially is discovered, must be considered in determining under the *Bell* analysis whether the search was reasonable.").[2]

In determining whether an individual search or seizure is reasonable, we evaluate the "totality of [the] circumstances," *Missouri v. McNeely*, 133 S. Ct. 1552, 1559 (2013), including "[1] the scope of the particular intrusion, [2] the manner of its conduct, and [3] the justification for initiating it." *Cameron*, 538 F.2d at 258 (internal quotation marks omitted). We address these three considerations in turn.

The scope of the seizure intruded beyond the surface of Fowlkes' body, interfering with his bodily integrity. As the

---

[2] Whether the officers' conduct here is labeled a "search" or a "seizure" is immaterial to the legal analysis. We use the term "seizure" because Sergeant Gibbs saw a plastic bag protruding from Fowlkes' anus and had probable cause to believe it was contraband. Thus, there was no need for a "search" as that word is commonly understood; all that remained was to seize evidence that had already been found. We have in some opinions, including *Cameron*, referred to this conduct as a search. Semantics aside, this case is like *Cameron* because the officers' actions are challenged *not* because the officers lacked sufficient certainty that evidence was located inside Fowlkes' body, but instead because, even assuming sufficient certainty, the manner of removing the evidence was unreasonable. Where the probability of finding evidence in the place to be searched is at issue, different Fourth Amendment concerns and protections are implicated (for example, a warrant serves to ensure that sufficient cause exists to search a particular location). But even when those concerns are not present, our decision in *Cameron* clearly stands for the proposition that the manner of extraction—whether termed a search or a seizure—is subject to a reasonableness requirement under the Fourth Amendment.

Supreme Court explained in *Schmerber*, "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." 384 U.S. at 767. The Court has subsequently described the interest in bodily integrity as implicating the "most personal and deep-rooted expectations of privacy." *Lee*, 470 U.S. at 760 (holding a compelled surgical intrusion to remove a bullet, fired by a robbery victim, from the chest of the suspect unreasonable under the Fourth Amendment); *see also Cameron*, 538 F.2d at 258 ("[T]he fourth amendment imposes a stricter standard on the 'means and procedures' of a body search than does the due process clause."). And here, the seizure interfered with a particularly personal, private area of Fowlkes' anatomy.

Likewise, the manner in which this seizure was conducted supports the conclusion that it was unreasonable. In making this determination, we consider a variety of factors including hygiene, medical training, emotional and physical trauma, and the availability of alternative methods for conducting the search. *See Vaughan v. Ricketts*, 859 F.2d 736, 741 (9th Cir. 1988), *abrogated on other grounds by Graham v. Connor*, 490 U.S. 386 (1989); *see also Thompson v. Souza*, 111 F.3d 694, 700–01 (9th Cir. 1997) (considering hygiene and medical training of officers in evaluating the reasonableness of the search).

As an initial matter, the officers violated the jail's own written policy for body cavity searches by failing to remove the evidence "under sanitary conditions" and by not using a "Physician, Nurse Practitioner, Registered Nurse, Licensed Vocational Nurse, or Emergency Medical Technician." There is no evidence that any of the officers had medical or any other relevant training on how to safely remove

suspicious objects from an arrestee's rectum or how to evaluate whether such removal could cause serious physical harm or death.**3** The manner of this seizure is the very sort the Supreme Court explicitly distinguished from the blood test it found "performed in a reasonable manner" in *Schmerber*:

> We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

384 U.S. at 771–72. As the Supreme Court accurately predicted forty-years ago, tolerating such invasive conduct by non-medical personnel invites an unjustified element of personal risk—a risk that Fowlkes experienced first-hand and one that is constitutionally intolerable.**4**

---

**3** The dissent argues that, in the absence of medical testimony regarding the dangers presented by the seizure here, we can only speculate about medical necessity. Dissent at 38, n.8. While there is no testimony on the issue, however, LBPD policy suggests that when physical intrusion into a body cavity is necessary, medical personnel, rather than LBPD officers, should perform the task.

**4** As the dissent correctly notes, we have applied *Schmerber* to both visual and physical body cavity searches. *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1449 (9th Cir. 1991). This does not mean, however, that

In *Cameron*, then-Judge Anthony M. Kennedy explained that Cameron, like Fowlkes, was in a humiliating and dangerous situation: "[T]he person accused of concealing contraband within his body is faced with the real prospect that the most intimate portions of his anatomy will be invaded and that he will suffer resulting pain or even physical harm." 538 F.2d at 258. We also recognized that Cameron, like Fowlkes, was particularly vulnerable and totally alone: "[T]he suspect usually faces this ordeal without assistance, surrounded by persons who administer the procedure on behalf of the government and thus appear to him to have as their overriding motive the obtaining of evidence to convict, and not his personal well being." *Id.*

After detailing the unique dangers, fears, and concerns faced by detainees like Fowlkes, we held that the process for removing suspected contraband from a detainee's body, "if it is to comport with the reasonableness standard of the fourth amendment, must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma." *Id.* We further clarified that "[i]n a situation thus laden with the potential for fear and anxiety, a reasonable search will include, beyond the usual procedural requirements, reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer." *Id.*

Here, the LBPD officers did not take adequate steps to minimize Fowlkes' physical trauma. They did not, for example, use lubrication or ensure that the removal was conducted under sanitary conditions; they did not seek the

---

visual searches and physical searches and seizures are identical with regard to whether they "might . . . invite an unjustified element of personal risk of infection and pain." *Schmerber*, 384 U.S. at 772.

guidance or assistance of medical personnel; and they did not assure themselves that removing the object from Fowlkes' rectum was safe—indeed they did not know the size, shape, or substance of the object. Further, they did nothing to mitigate his anxiety or emotional trauma. They did not, for example, offer him options for removing the contraband or secure his compliance; they did not (and could not) assure him that the removal was safe or being conducted by a trained professional; and they did not (and could not) assure him that the procedure was legal and in keeping with LBPD policy rather than an arbitrary show of force.

Far from taking steps to minimize physical harm and mitigate anxiety, as required by *Cameron*, the officers' actions potentially increased the physical and emotional trauma Fowlkes suffered. Despite undisputed testimony by the officers themselves that Fowlkes posed no threat, much less an immediate threat to himself or the officers, and was not a flight risk (he was naked, bent over, and in handcuffs at the time), Sergeant Gibbs used a stun-gun taser to shock Fowlkes in an apparent effort to subdue him. *Cf. Bryan v. MacPherson*, 630 F.3d 805, 832 (9th Cir. 2010); *Mattos v. Agarano*, 661 F.3d 433, 446 (9th Cir. 2011) (en banc) (holding a finder of fact could find the use of a drive stun taser against a person posing no immediate threat unreasonable and unconstitutionally excessive). Once Fowlkes was subdued, the officers proceeded with the degrading and dangerous removal of the as yet unidentified cocaine from Fowlkes' rectum.[5]

---

[5] The dissent suggests that it is immaterial that the materials lodged inside of Fowlkes' body were unidentified, because they were indisputably contraband. *See* Dissent at 34–35. But knowing that an object is contraband is not the same as knowing the object can be safely removed.

These actions stand in stark contrast to the conduct found reasonable in *Schmerber* and are much more like the conduct found unreasonable by the Fourth Circuit in *Edwards*. In *Schmerber*, the Court explicitly considered that the blood draw in question "involves virtually no risk, trauma, or pain," and that it "was performed in a reasonable manner" because "blood was taken by a physician in a hospital environment according to accepted medical practices." 384 U.S. at 771. In *Edwards*, by contrast, the court determined that the manner in which an officer removed a plastic bag that an arrestee had tied around his penis was unreasonable. 666 F.3d at 884. The officer put on gloves and then used a knife to cut the bag off the suspect's penis. The Fourth Circuit concluded that the manner of the removal "posed a significant and an unnecessary risk of injury to Edwards, transgressing well-settled standards of reasonableness. The fortuity that Edwards was not injured in the course of this action does not substantiate its safety." *Id.* at 885.[6]

As in *Edwards* and *Cameron*, the officers here should have done more to "allay the anxieties and concerns of the suspect," and should have considered "less intrusive means

---

The officers' lack of information about the object—its precise size, shape, and texture; whether the surrounding plastic was abraded; whether the inside of Fowlkes' rectal cavity was injured; and whether the substance inside could potentially poison him—highlights the heightened "personal risk" inherent in the physical search. *See Schmerber*, 384 U.S. at 772. That Fowlkes may have been acting unlawfully by smuggling an item into jail does not affect this calculus.

[6] To be clear, our holding does not preclude touching of the defendant or seizure of contraband from a suspect's rectum in all cases. As in *Edwards*, we hold only that the particular manner of seizing evidence employed by the LBPD in this case was unreasonable.

of obtaining the evidence." *Cameron*, 538 F.2d at 258. There are any number of alternative methods the officers could have considered employing to recover this evidence. This is not to require a least-restrictive alternative test as determinative of reasonableness, but it would have been more reasonable simply to comply with the jail's written policy and summon medical personnel. And there was ample opportunity to do so. Before strip searching Fowlkes, Sergeant Gibbs was informed by another officer that Fowlkes had "put a baggie down his pants." Rather than readying medical personnel or at least determining whether medical personnel were available to facilitate compliance with LBPD policy, Gibbs instead retrieved a taser from his vehicle and put on latex gloves.[7] Then, after observing a baggie protruding from Fowlkes' rectum, without securing judicial authorization, Fowlkes' compliance, or medical personnel, and without assurances that doing so was safe or could be done without causing severe pain, Gibbs simply extracted the unidentified object.

Moreover, although we do not hold that a warrant was required, we must "consider that the government failed to obtain a warrant" in "evaluating the reasonableness of the manner in which the search [or seizure] was conducted." *Cameron*, 538 F.2d at 258. "In addition to certifying that a search [or seizure] is reasonably justified a warrant can also assure that it is conducted in a reasonable manner." *Id.* at 259. A warrant can, for example, dispel a suspect's concerns that he is being subject to illegal, arbitrary procedures. *Id.* The warrant also clarifies the means of seizure the

---

[7] These facts show that Gibbs had time to take additional precautions, and thus they are relevant in assessing the objective reasonableness of Gibbs' conduct.

government may employ, which may in turn secure the cooperation of the suspect, reducing the risk of physical trauma attendant with removing evidence from a suspect's body. *Id.* Thus, the officers' failure to secure a warrant is yet another way in which they did not mitigate the risk of physical and emotional trauma associated with the seizure of evidence from Fowlkes' rectum.

Just as the scope of the intrusion into Fowlkes' privacy and the manner in which the seizure was conducted suggest that the officers acted unreasonably, the justifications—or lack thereof—for seizing the evidence in the chosen manner reinforce our conclusion that the officers acted unreasonably. *See Cameron*, 538 F.2d at 258. As in *Cameron*, where officers were all but certain the suspect had secreted drugs in his rectum, here "there was no emergency requiring instant seizure of the evidence." *Id.* at 259. The government is correct that a warrantless search may be conducted if an officer reasonably believes that evidence will be destroyed if he does not act quickly, so long as the search is conducted in a reasonable manner. *See, e.g.*, *Schmerber*, 384 U.S. at 770–71. But the record is devoid of any evidence from which the officers reasonably might have inferred that evidence would be destroyed if they took the time to secure a warrant and summon medical personnel. When the baggie was removed, Fowlkes was handcuffed, tased, and surrounded by five police officers. He was under arrest and in the custody of the LBPD. Fowlkes, like the evidence lodged inside his rectum, was not going anywhere.[8]

---

[8] The dissent contends that Gibbs' testimony constitutes evidence from which officers might reasonably have inferred that the evidence protruding from Fowlkes' anus would be destroyed if they did not seize it. Dissent at 35. Gibbs' testimony, however, only proves that he *subjectively*

Similarly, the record contains no evidence that a medical emergency existed. *See Cameron*, 538 F.2d at 259 & n.8 ("There were no facts on the record indicating that failure to remove the heroin would constitute a danger to the suspect. . . . [O]nly a showing of the greatest imminent harm would justify intrusive action for the purpose of removal of the drug."); *see also Johnson v. United States*, 333 U.S. 10, 15 (1948) ("No suspect was fleeing or likely to take flight."). Thus, there was time to take steps—potentially including, *inter alia*, securing medical personnel, a warrant, or both—to mitigate the risk that the seizure would cause physical and emotional trauma.

Further, the practicability concerns underlying *Bull* and *Florence* are absent here. While we have approved suspicionless visual strip searches in the prison intake context given the government's need to keep contraband out of prisons and the sheer volume of incoming inmates, the government does not contend that it is necessary to seize evidence from the body cavities of every person booked into the Long Beach City jail. In *Bull*, for example, over a sixty month period, from April 2000 to April 2005, visual body cavity searches revealed only seventy-three cases of illegal drugs or drug paraphernalia hidden in arrestees' body cavities—a rate of approximately fifteen cases a year. 595 F.3d at 969. And, in *Bell*, the Supreme Court noted "only one instance" where an inmate was discovered attempting to smuggle contraband into the institution in this manner. 441 U.S. at 558.

---

*believed* evidence might be destroyed if he did not seize the baggie quickly; the record remains devoid of evidence suggesting that Gibbs' subjective belief was objectively reasonable.

The relatively small numbers of inmates concealing contraband in their body cavities undercuts any argument that it would be impractical to take additional "steps to mitigate the anxiety, discomfort, and humiliation that . . . suspect[s] [like Fowlkes] may suffer." *Cameron*, 538 F.2d at 258. One step in particular, obtaining a warrant, would place very little burden on the government given these small numbers and technological advancements that facilitate nearly immediate access to warrants.[9] *See id.* at 259 ("It should not have been difficult to obtain a warrant . . . ."). That LBPD policy requires medical personnel to perform cavity searches under sanitary conditions also suggests that there were no practical obstacles to taking these additional steps to mitigate the potential danger to prisoners like Fowlkes.

In the end, the LBPD conducted a warrantless forcible seizure of an unidentified item of unknown size from Fowlkes' rectum by non-medical personnel who (1) did nothing to assure that the removal was safe and performed under sanitary conditions; (2) were aided by the use of a taser but not by lubricant; (3) seized the object in the absence of exigent circumstances; and (4) acted in violation of LBPD policy. No single factor is dispositive, but under the totality of the circumstances presented here, we conclude that the manner of this seizure was unreasonable. *See Cameron*,

---

[9] "[A]dvances in the 47 years since *Schmerber* was decided . . . allow for the more expeditious processing of warrant applications, particularly in contexts . . . where the evidence offered to establish probable cause is simple. The Federal Rules of Criminal Procedure were amended in 1977 to permit federal magistrate judges to issue a warrant based on sworn testimony communicated by telephone. . . . And in addition to technology-based developments, jurisdictions have found other ways to streamline the warrant process, such as by using standard-form warrant applications . . . ." *McNeely*, 133 S. Ct. at 1561–62.

538 F.2d at 258–60. The district court therefore erred in admitting the unreasonably seized evidence at Fowlkes' trial.

## C.

Finally, numerous jurisdictions have concluded in similar circumstances that such warrantless conduct violates the Fourth Amendment. *See, e.g.*, *Meeks v. City of Minneapolis*, 822 F. Supp. 2d 919 (D. Minn. 2011) (granting summary judgment for plaintiff in a § 1983 suit on the claim that officers' conduct in pulling an item protruding from defendant's anus while he was pushed up against a squad car violated his Fourth Amendment rights); *United States v. Broadway*, 580 F. Supp. 2d 1179, 1185 (D. Colo. 2008) (suggesting that "actual touching, penetration, attempted touching, or attempted penetration of Defendant's anus or anal cavity" might constitute unreasonable scope or manner of search); *State v. Barnes*, 215 Ariz. 279, 281 (Ariz. Ct. App. 2007) ("[A]n officer must secure a warrant to remove items partially protruding from an arrestee's rectum."); *State v. Robinson*, 937 A.2d 717, 728–29 (Conn. App. Ct. 2008) (noting that, under Connecticut law, police must procure a warrant before obtaining contraband from a defendant's anus, but finding that the search at issue was not a body cavity search because "the bag was wholly outside of the defendant's rectum"); *People v. Hall*, 10 N.Y.3d 303, 311 (2008) ("[T]he removal of an object protruding from a body cavity, regardless of whether any insertion into the body cavity is necessary, is subject to the *Schmerber* rule and cannot be accomplished without a warrant unless exigent circumstances reasonably prevent the police from seeking prior judicial authorization."); *Hughes v. Commonwealth*, 524 S.E. 2d 155, 162 (Va. Ct. App. 2000) (holding that a search in which officer asked suspect to bend over, inspected

his anus, instructed him to cough, then manually removed plastic bag protruding from suspect's anus violated suspect's Fourth Amendment rights).

This persuasive authority reinforces our conclusion that the seizure of evidence from Fowlkes' rectum, under the totality of the circumstances, violated his Fourth Amendment rights, and that the district court therefore should have suppressed the evidence.[10]

## III.

Although the district court erred in failing to suppress the evidence seized from within Fowlkes' body, it properly denied Fowlkes' remaining motions.

## A.

Fowlkes asserts that an apparent discrepancy between the person who prepared the government's application for the wiretap and the person who signed it renders the interception of the wire communications "unlawful" and mandates suppression of any evidence obtained as a result of that wiretap. At a minimum, he claims the district court erred in denying him a *Franks*[11] hearing because the affidavit in

---

[10] The Government has not argued that the instant Fourth Amendment violation warrants a remedy other than suppression, so we do not consider alternative sanctions for the officers' conduct.

[11] "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the

support of the wiretap contained material misrepresentations and omissions. Because any technical deficiencies in the wiretap application do not warrant suppression and because Fowlkes' *Franks* claim is without merit, the district court did not err in denying the motion to suppress.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, governs wiretapping by law enforcement. *United States v. Garcia-Villalba*, 585 F.3d 1223, 1227 (9th Cir. 2009). Evidence obtained from a wiretap must be suppressed if "the communication was unlawfully intercepted." 18 U.S.C. § 2518(10)(a)(i). In *United States v. Chavez*, the Supreme Court held that establishing a rule in which "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications unlawful" "would be at odds with the statute itself." 416 U.S. 562, 574–75 (1974) (internal quotation marks omitted). Rather, "suppression is required only for a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Donovon*, 429 U.S. 413, 433–34 (1977) (internal quotation marks omitted).

Here, any technical deficiency caused by one AUSA signing for another does not constitute a failure to satisfy such a statutory requirement. The affidavit prepared by Agent Jonathan Koeppen in support of the wiretap application satisfies the statutory requirements of 18 U.S.C.

Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

§ 2518(1)—it was prepared in writing by an investigative or law enforcement officer, it stated Koeppen's authority to make an application, it provided a full and complete statement of the facts and circumstances relied upon, and it was signed under oath. We have previously implied that an affidavit attached to a wiretap application can fulfill the requirements of 18 U.S.C. § 2518(1) in lieu of the application itself. *See Garcia-Villalba*, 585 F.3d 1223, 1227–28 (9th Cir. 2009) (evaluating whether the *affidavit* contained the full and complete statement as to whether other investigative procedures had been tried and failed as required by 18 U.S.C. § 2518(1)(c), which governs the requirements of a wiretap *application*); *United States v. Fernandez*, 388 F.3d 1199, 1234–37 (9th Cir. 2004).

The only statutory requirement that Koeppen's affidavit failed to meet was to identify the officer authorizing the application, as required under 18 U.S.C. § 2518(1)(a). The Supreme Court, however, has held that misidentification of the authorizing officer in the wiretap application is not a technical deficiency that requires suppression. *Chavez*, 416 U.S. at 575. So too here. Exhibit A attached to the wiretap application did provide authorization for the wiretap, and the singular failure of Agent Koeppen's affidavit to identify the authorizing official does not warrant suppression.

The district court did not err in denying a *Franks* hearing because Fowlkes has not shown that "the allegedly false statement[s] [were] necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. Even if we accept as true all of Fowlkes' allegations regarding misstatements and omissions in Koeppen's affidavit, Fowlkes still must "show that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding

of probable cause." *United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985) (citing *Franks*, 438 U.S. at 171–72). This he cannot do. The affidavit contains many unchallenged factual allegations linking the phones and implicating Target Telephone #2 in the service of drug trafficking. These include numerous calls between the phones, shared subscriber information, high call volume, and toll information connecting one phone to suspected narcotics traffickers.

## B.

Fowlkes also asserts that the district court erred in denying his motion to suppress the 2.6 grams of cocaine seized from his apartment because the officers' warrantless entry was unlawful and the warrant authorizing the search was unsupported by probable cause. As the district court correctly found, however, probable cause coupled with exigent circumstances justified the officers' warrantless entry, and the warrant itself was supported by probable cause. *See United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002) ("Even when exigent circumstances exist, police officers must have probable cause to support a warrantless entry into a home.").

Probable cause justifying a warrantless entry requires the government to show a "fair probability that contraband or evidence of a crime" was in the residence. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001). Examining the totality of the circumstances known to the officers at the time, *Alaimalo*, 313 F.3d at 1193, the officers here had probable cause sufficient to believe there was contraband at Fowlkes' Cedar Avenue apartment. Officers intercepted a voicemail suggesting that Fowlkes paid rent for the apartment. They

also intercepted calls in which Fowlkes mentioned undercover officers and referenced "get[ting] everything out of" the premises and "trash[ing]" his phone because he's "not gonna give them shit to put together on me." On this basis, the officers reasonably concluded that drugs were present at Fowlkes' Cedar Avenue apartment. *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) ("In the case of drug dealers, evidence is likely to be found where the dealers live.").

Exigent circumstances include "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent . . . the destruction of relevant evidence." *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824 (1984)). The September 4 calls further support a finding of exigent circumstances. During those calls, Fowlkes stated, "It's a 911 . . . . The homie said the police is outside in the back . . . . I was gonna tell you to take that shit over to Keisha's house," and he instructed the person on the other end of the line to "move that computer and the rest of all that you know, just get everything out of here . . . ." As the district court correctly found, those intercepted communications, viewed as they would reasonably appear to a prudent law enforcement officer, could have led to the conclusion that it was necessary to enter and secure the Cedar Avenue apartment to prevent Fowlkes from destroying contraband. The one-hour lapse between the last intercepted call and officers' entry into the apartment did not undermine the exigency of the situation. In *United States v. Lindsey*, 877 F.2d 777, 782–83 (9th Cir. 1989), we held that a delay of the same duration did not negate the exigency because the delay was caused by officers awaiting reinforcements. Similarly, here the delay occurred

because of the time it took officers to respond and then "coordinate[] their efforts" for entry.

Finally, the magistrate judge did not clearly err in finding probable cause sufficient to support the search warrant for the apartment. *See United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011). The affidavit in support of the warrant alleged the following: 1) Fowlkes was a cocaine distributor; 2) he was using a phone that was the subject of an ongoing wiretap; 3) he resided at 2310 Cedar Avenue, Apartment 3, Long Beach, CA; and 4) during a phone call on one of the tapped phones, Fowlkes instructed a woman to clear out the place, including the computer, which the affiant interpreted as telling the woman to remove all evidence of narcotics distribution from the Cedar Avenue apartment. These facts are sufficient to support the magistrate's finding of probable cause. Fowlkes' assertion that the affidavit contained material misrepresentations and omissions is unavailing. As the district court correctly found, some of Fowlkes' allegations lack evidentiary support. The other errors he points to appear to be simply typographical errors, which do not alter the substance of the affidavit.

## C.

Finally, the district court correctly denied Fowlkes' motion to suppress the cocaine base seized from his car. An officer may conduct a traffic stop if the officer has "probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). "The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop." *United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000). Here, the officer observed an expired temporary

operating permit on the car Fowlkes was driving, which provided the basis for the *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968).

The search of the car was likewise appropriate under the automobile exception to the warrant requirement, which allows police officers to "conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband." *United States v. Pinela-Herandez*, 262 F.3d 974, 977–78 (9th Cir. 2001). A determination of probable cause is based on the "totality of the circumstances" known to the officers, *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986), and because the officers were acting in concert in this case, we "look[] to the collective knowledge of all the officers involved in the criminal investigation." *United States v. Ramirez*, 473 F.3d 1026, 1032–37 (9th Cir. 2007) (internal quotation marks and citation omitted). Here, the officers who ordered the traffic stop had just observed what they believed, based on previous surveillance of Fowlkes and their own experiences, to be a narcotics transaction between Fowlkes and another individual. Once the car was pulled over and Fowlkes was ordered to get out of the car, officers observed small, off-white rock-like chips on the driver and passenger seats in plain view and a green, leaf-like substance inside a clear bag in plain sight. Based upon the totality of these circumstances, the district court properly denied Fowlkes' motion to suppress the evidence found in the car.

## IV.

The district court did not clearly err when it found, following its grant of Fowlkes' request for a mistrial, that the government had not "goad[ed]" him into making the request. *See United States v. Lun*, 944 F.2d 642, 644 (9th Cir. 1991).

"[O]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *United States v. Lopez-Avila*, 678 F.3d 955, 962 (9th Cir. 2012) (internal quotation marks omitted).

Fowlkes asserts that the government's conduct in arresting Marshall, a witness who had just testified for the defense, immediately outside the courtroom doors and within sight and hearing of the jury, goaded him into requesting the mistrial. The trial court, after two days of evidentiary hearings, found it could not "conclude that the arrest of Ms. Marshall was done in bad faith or with the intention to secure a mistrial." The evidence supports the district court's finding "that the government did not intentionally effectuate Ms. Marshall's arrest so as to bring it to the attention of the jury." Indeed, the jury was able to observe the arrest only because the glass panes on the courtroom doors afforded them a view of the hallway where the arrest was taking place. Given these facts, the district court's finding is not clearly erroneous. *See United States v. Hagege*, 437 F.3d 943, 951–52 (9th Cir. 2006). Moreover, while not conclusive, the government's opposition to Fowlkes' motion for a mistrial supports the district court's finding of a lack of intent. *See United States v. McKoy*, 78 F.3d 446, 449 (9th Cir. 1996) (considering the government's opposition to a motion for mistrial as a factor in affirming the district court's finding that the government did not intentionally goad the defendants into seeking a mistrial).

**V.**

For the foregoing reasons, we affirm in part and reverse in part. We vacate Fowlkes' conviction and sentence on Count V, which was predicated on the drugs unconstitutionally seized from his body cavity, and remand for re-sentencing consistent with this decision.[12]

**AFFIRMED, REVERSED, VACATED, and REMANDED.**

---

[12] Fowlkes was sentenced to time served with an eight-year term of supervised release, of which he has served approximately four years. The district court made this term subject to a review of the Fair Sentencing Act of 2010. We therefore decline to reach Fowlkes' challenge to the propriety of his original sentence under the Fair Sentencing Act of 2010, and leave that issue in the hands of the district court.

RESTANI, Judge, dissenting in part.

Because I believe the facts found by the district court, which the majority does not contend were clearly erroneous, render the warrantless search and seizure reasonable under the totality of the circumstances, I dissent from the majority's decision to suppress the evidence seized during the jailhouse search.[1]

## I.

The majority begins its discussion of the present case by choosing to describe the facts surrounding the jailhouse search in the most unfavorable light, at times engaging in wholesale speculation, to portray this case as one involving brutal, unnecessary police action. I believe it is helpful to clarify some of the more important factual considerations in order to fairly lay out the context the court must consider in evaluating the reasonableness of the police actions at issue.[2]

The majority opinion makes much of the fact that Gibbs "brought along his taser, gloves and 'assistance' in the form of additional officers because he thought Fowlkes might have drugs" and "retrieved a taser from his vehicle and put on latex

---

[1] I concur in the reasoning of the majority opinion with respect to all other issues raised on appeal.

[2] Of course, as an appellate court, we are not to engage in independent fact finding, deferring instead to the findings of the district court unless they are clearly erroneous. In seemingly making new factual findings, the majority appears dissatisfied with the lack of clear factual findings in the district court's order. If this is so, the remedy would be to remand to the district court, not to engage in our own weighing of the disputed facts, without the benefit of live testimony.

gloves." *See* Maj. Op. at 5, 19.  Not only is this insinuation of an improper pre-search intent irrelevant under the objective test used to evaluate the reasonableness of the search, but Gibbs provided testimony, which the trial court appeared to credit, plausibly explaining all of his actions. Gibbs testified that he wore gloves during all strip searches in the event he recovered evidence that was hidden on or in the arrestee's body, because these items might be used as evidence (in which case fingerprints and/or DNA evidence might need to be protected) and because the items could have bodily fluids on them (posing a health hazard).  He also explained that he brought his taser from his patrol vehicle, after obtaining permission to bring it into the jail, because Fowlkes had been verbally aggressive, and Fowlkes was a large individual (over six feet tall and 250 pounds).**[3]**

The majority also downplays an important fact in describing the search in this case.  *See id.* at 11–12.  The officers here were not completely in the dark as to what they were seeking to seize, probing inside Fowlkes as part of a wild goose chase.  Instead, testimony from Officer Harris made clear that the officers knew that the object protruding from Fowlkes' body cavity was unmistakably contraband for two reasons: a) it was an undisclosed plastic baggie, and b) it was almost certainly drugs.**[4]**  Officer Harris described the bag

---

**[3]** The majority's statement that Fowlkes posed no threat at all to the officers simply is not supported by the record, although it was acknowledged that Fowlkes was not physically aggressive, only verbally aggressive, prior to the search.  Maj. Op. at 17.

**[4]** Contraband refers to any unauthorized item, not just illegal items, including lighters, matches, currency, and pens.  *See Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1519 (2012) ("*Contraband* is any item that is possessed in violation of prison rules.  Contraband obviously

as "a white object slightly protruding . . . maybe a little bit less than a golf ball size, off-white substance in a plastic baggy. Or inside plastic."

Finally, the majority asserts that "the record is devoid of any evidence from which the officers might reasonably have inferred that evidence would be destroyed if they took the time to secure a warrant and summon medical personnel." *Id.* at 20. Contrary to this assertion, Gibbs testified during the evidentiary hearing on the motion to suppress that he was concerned the evidence could be destroyed or adulterated by Fowlkes. In fact, Gibbs explained that during past searches, he had witnessed defendants, who had secreted drugs into their body cavities, attempt to crush and swallow them during the strip search. Moreover, Gibbs explained that it was not uncommon for arrestees to become physically violent in order to prevent recovery of the contraband once it fell out. Thus, contrary to the majority's conclusion, Gibbs' testimony indicates that it was objectively reasonable to believe that Fowlkes might destroy the evidence. *See* Maj. Op. at 20–21 n.8.

---

includes drugs or weapons, but it can also be money, cigarettes, or even some types of clothing." (quoting *Prisons: Today and Tomorrow* 237 (J. Pollock ed. 1997)). Here, when the object was protruding, the officers could see that it was a plastic bag with an off-white substance inside, and thus it was readily apparent that Fowlkes possessed an unauthorized object. Contrary to the majority's suggestion, I do not believe that the officer's knowledge of the type of contraband secreted inside the arrestee's body is immaterial, and in this case, we need not consider the situation where the unauthorized nature or general character of the object is not apparent. *See* Maj. Op. at 17–18 n.5.

## II.

Having set out the facts, tethered to the record before us, I turn now to the majority's holding that the search[5] was unreasonable.

"The expectations of privacy of an individual taken into police custody necessarily are of a diminished scope. Both the person and the property in his immediate possession may be searched at the station house. A search of the detainee's person when he is booked into custody may involve a relatively extensive exploration . . . ." *Maryland v. King*, 133 S. Ct. 1958, 1978 (2013) (internal quotation marks, brackets, and citations omitted). "Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, . . . his or her expectations of privacy and freedom from police scrutiny are reduced." *Id.*

Under the Fourth Amendment, "[e]ven if a warrant is not required, a search . . . must be reasonable in its scope and manner of execution." *Id.* at 1970. The reasonableness analysis is fact-intensive and requires considerations of issues such as privacy, hygiene, and the training of those conducting the search. *See Vaughan v. Ricketts*, 859 F.2d 736, 741 (9th Cir. 1988), *abrogated on other grounds by Graham v. Connor*, 490 U.S. 386 (1989); *see also United States v. Carpenter*, 496 F.2d 855, 855 (9th Cir. 1974) (per curiam). To determine the reasonableness of a search, we balance the "scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in

---

[5] As the majority notes at footnote 2, whether a police action is termed a "search" or a "seizure" is immaterial to the legal analysis. Accordingly, the dissent uses the terms interchangeably.

which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Although the majority is correct that under *Schmerber v. California*, 384 U.S. 757 (1966), any bodily intrusion is a search within the meaning of that term, "[t]he fact that an intrusion is negligible is of central relevance to determining reasonableness." *King*, 133 S. Ct. at 1969.[6] The removal of the protruding object here admittedly required an invasion of Fowlkes' privacy interests beyond that of a visual search. The removal, however, did not require any further touching, intrusion, or probing into Fowlkes' body.[7] This simply is not

---

[6] In *Fuller v. M.G. Jewelry*, we stated that *Schmerber*'s reference to "intrusions into the body" applies to "all searches that invade the interior of the body . . . [including] a visual intrusion into a body cavity." 950 F.2d 1437, 1449 & n.11 (9th Cir. 1991) (noting the Ninth Circuit, unlike other courts, has not limited *Schmerber* to cases in which skin is pierced or entry is forced). Thus, even the visual inspection of the body cavity here was an intrusion into the human body under *Schmerber*, but as noted by the majority, that particular intrusion into the body is justified by the need to maintain institutional security. *See Bell*, 441 U.S. at 560. Thus, *Schmerber* does not require a warrant or exigent circumstances for all searches involving intrusion beyond the body's surface.

[7] The majority relies on the Fourth Circuit's opinion in *United States v. Edwards*, 666 F.3d 877 (4th Cir. 2011). Although the majority there held the search unreasonable because a knife was used to remove a bag of drugs tied to the defendant's genitals, the majority did not preclude any touching of the defendant. *See id.* at 886. Instead, the majority suggested other permissible alternatives including "untying the baggie, removing it by hand, tearing the baggie, requesting that blunt scissors be brought to the scene to remove the baggie, or removing the baggie by other non-dangerous means in any private, well-lit area." *Id.* (footnote omitted). The majority misunderstands this footnote as indicating that the majority's holding precludes any further touching of a suspect or seizure of contraband from a suspect's rectum in all future cases. Maj. Op. at 18 n.6. I make no such suggestion.

a case where the search required the government to probe inside the subject's body cavity based on the belief that contraband might be concealed inside. Rather, it was a search that involved negligible additional intrusion and was based on the presence of contraband in plain sight.

Additionally, unlike in *Carpenter*,[8] Fowlkes presented no medical testimony related to the danger of removing the protruding plastic bag, nor did Fowlkes argue that he was at risk for injury or was injured by the removal. Fowlkes' assertion before the district court was that Gibbs forcefully inserted his fingers into Fowlkes' anal cavity and probed,

---

[8] In *Carpenter*, two judges concurred in the two sentence per curiam opinion to limit the holding to the particular facts of that case. *See* 496 F.2d at 856 (Chambers, J., concurring) ("I regard the case as one . . . of no precedential value except on a similar record."); *id.* (Taylor, J., concurring) ("I am constrained to concur in reversing the conviction of appellant only because of the record made on remand . . . ."). In *Carpenter*, the district court credited testimony from the government's expert witness that a doctor should have been summoned to dilate the anal cavity and did not credit other testimony from the same expert that the object could be removed by a customs official without danger. *Id.* at 856. Both concurring judges stated that if not for this particular medical evidence credited by the district court, they would have concluded that a custom official could remove the protruding object. *Id.* at 856 (Chambers, J., concurring) ("The customs officer was entitled to assume the probable – that the package was one that went in without much trouble and would come out the same way."); *id.* at 856–57 (Taylor, J., concurring) (noting that despite the idealistic testimony of medical experts, common sense dictates that the inspector was entitled to perform the simple process of taking hold of and pulling the protruding end of the condom). As indicated, there is no medical testimony here, and we can only speculate as to what is considered necessary by medical professionals. That LBPD policy requires medical personnel to perform body cavity searches is not the same as medical testimony concerning the safety, propriety, and reasonableness of the search and does not rise to the level of testimony relied on in *Carpenter*. *See* Maj. Op. at 15 n.3.

unsuccessfully, for drugs, facts that were rejected by the district court. As a result, Fowlkes made no allegations as to the harm caused by the actual removal of the protruding plastic bag, and there is nothing on the record from Fowlkes' perspective indicating that the manner of removal was dangerous or harmful. Instead, the record states that the search was performed in a private area by LBPD officers wearing gloves and of the same sex as Fowlkes. The plastic bag was protruding far enough so that Gibbs could grab the bag with two fingers and pull it out, and there is no indication that this process was difficult or prolonged.

The only evidence on the record suggesting that the removal caused Fowlkes any pain or discomfort is a picture of the plastic bag after it was removed, which shows substances that appear to be blood and feces on the bag. Fowlkes argues the officers planted the plastic bag in the strip search room and denied that it was recovered from his body cavity. Thus, there is no testimony from Fowlkes as to the existence of the plastic bag inside of him or the manner of its removal, and there is nothing on the record demonstrating that the possible presence of blood on the bag was caused by the officers' conduct, as opposed to Fowlkes' own conduct of forcing the plastic bag into his anal cavity, or his attempt to push the bag further into his anal cavity during the search. *See Thompson v. Souza*, 111 F.3d 694, 700 (9th Cir. 1997) ("[T]he prisoner 'bears the burden of showing that [prison] officials intentionally used exaggerated or excessive means to enforce security.'" (second alteration in original)) (quoting *Michenfelder v. Summer*, 860 F.2d 328, 333 (9th Cir. 1988)).

At the same time, the context of the search diminished Fowlkes' reasonable expectation of privacy and provided a strong justification for the search. Here, Fowlkes was strip

searched pursuant to a blanket LBPD policy that all individuals booked on felony charges are subject to a strip search before being housed in "General Population Felony cells."[9]  The undisputed testimony is that the purpose of this policy is to "prevent the introduction of contraband or weapons into the jail."  Thus, because the search here was performed in order to maintain institutional security and order, we should evaluate the reasonableness of the search given this particular context.  *See Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 971–72 (9th Cir. 2010) (citing *Bell*, 441 U.S. at 547) (noting that prison policies must be evaluated in the light of the prison's primary objective of institutional security). The removal occurred during the jail intake process, after a felony arrest supported by probable cause, after Fowlkes attempted to smuggle contraband into the jail, and after a lawful visual inspection revealed the contraband in plain sight.  Given the government's interest in preventing the introduction of contraband into the facility, I believe that although removing the protruding object from Fowlkes' body was an invasion of privacy beyond that caused by a visual cavity inspection, we must conclude from this record that the search was nevertheless reasonable.[10]

---

[9] My views are not directed to any due process claim in a separate action under 42 U.S.C. § 1983, stemming from the officers' failure to follow the jail's own regulations.  *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1155 (9th Cir. 2012).

[10] For this reason, I find the majority's reliance on the series of cases cited on pages 12–13 of its opinion to be inapposite, as they are outside of the jail context and do not deal with facts analogous to the present case. Under *Bull*, these cases are distinguishable because "[c]ases that address searches of arrestees at the place of arrest, searches at the stationhouse prior to booking or placement in a holding cell, or searches pursuant to an evidentiary criminal investigation do not control our review."  595 F.3d at 971.

On the suppression record before us, which demonstrates the object was removed without any intrusion into the anal cavity,[11] without any significant injury, harm, or pain to Fowlkes, and in a sanitary and private environment, I cannot conclude that the manner of removal was in violation of the Fourth Amendment.[12]

---

[11] The removal of a protruding object raises different, and less grave, considerations for health than when contraband is fully inserted inside a cavity and can only be located and removed through digital penetration and probing. The actual probing for the inserted object may itself cause medical harm distinct from the removal of the item, and the officers may have no idea as to its shape, size, or location. Thus, without evidence we cannot assume a need for medical training when a protruding object is removed.

[12] Additionally, the facts in this case do not include those that we found, when combined with others, render the manner of removing an item unreasonable. For example, in *Vaughan*, we found a digital rectum search was performed unreasonably when conducted on an unsanitary table by medical assistants who were not trained in involuntary rectal searches, the assistants did not wash their hands between searches, and the search was visible to other inmates and prison personnel, including female prison officials. *Vaughan*, 859 F.2d at 741; *see also United States v. Cameron*, 538 F.2d 254, 258 (9th Cir. 1976) (finding two forced digital probes of rectum by a doctor, two enemas, and a liquid laxative administered without the presence of a doctor unreasonable, especially when performed without consideration of the subject's claim that he was under medical supervision for stomach and rectal problems). The search here did not involve penetration of the anal cavity, let alone multiple forced probes and enemas as in *Cameron* or the unsanitary conditions and lack of privacy as in *Vaughan*. Officers also took steps to minimize potential harm to Fowlkes and to protect his privacy by conducting the search in an apparently clean, private room dedicated for this purpose and by using medical gloves.

## III.

For the reasons above, I believe the seizure of the small baggie of obvious contraband during a constitutionally permissible strip search of a criminal detainee was reasonable under the totality of the circumstances.  In concluding, however, it is worth passing upon the "alternative methods"[13] of recovering the contraband alluded to by the majority.  *See* Maj. Op. at 6–7, 16–17, 19.  The majority mentions these alternatives only with respect to its conception of a reasonable method of seizure.  This may be because pleasant alternatives are less obvious under these circumstances.

I suppose the officers could have placed Fowlkes in an isolation cell, handcuffed, partially clothed, and under constant surveillance, allowing them to respond immediately when the baggie worked its way the other inch or so out of Fowlkes' body.  This hardly seems to be, per se, a less intrusive or offensive condition in which to place a detainee. *See, e.g.*, *Montoya de Hernandez*, 473 U.S. at 548 (Brennan, J., dissenting) (noting individual was able to avoid passing naturally any of the 88 drug-filled balloons secreted in her alimentary canal for almost 27 hours after initial detention despite her obvious need to use the restroom).

With respect to removal, certainly a medical professional is always preferable, but it remains a mystery whether one

---

[13] As the majority concedes, the existence of a less-intrusive alternative "does not, in itself, render the search unreasonable."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) (noting a creative mind "can almost always imagine some alternative means by which the objectives of the police might have been accomplished"); *see Bell*, 441 U.S. at 559 n.40 (rejecting the "less-restrictive-alternative" test as determinative of reasonableness).

was readily available to assist the officers in removing the baggie and what he or she would have done differently. Without such information and based on the totality of the circumstances, the lack of medical personnel did not render the seizure unreasonable. *See Florence*, 132 S. Ct. at 1513–14 ("In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security."); *Bull*, 595 F.3d at 976 ("When the allocation of resources and the ability of administrators to protect staff and detainees at the facility are at issue, 'courts should be particularly deferential to the informed discretion of corrections officials.'") (quoting *Turrner v. Safley*, 482 U.S. 78, 90 (1987)). In sum, the factual record needed to find a Fourth Amendment violation warranting suppression is lacking.

Accordingly, I respectfully dissent.